G. W. DORSEY *vs.* SHEPPARD AND WIFE, AND SEARS.— *December* 1841.

Nuncupative wills are not favorites of the law.

The *factum* of a nuncupative will it requires to be proved, by evidence more strict, and stringent, than that of a written one in every single particular.

The testamentary capacity, and the *animus testandi*, at the time of the alleged nuncupation, must appear by the clearest, and most indisputable testimony.

A will made by interrogatory, may be valid; but when so made, the court must be more upon its guard against importunity, more jealous of capacity, and more strict in requiring proof of spontaniety, and volition, than it would be in an ordinary case.

A nuncupative will which contains no bequests, which merely appoints an executor, is not subject to the operation of the statute of frauds in relation to such testaments; nor to that of the act of 1810, chap. 34.

A written will, by the statute 12 *Car.* 2, *chap.* 24, is indispensible to the appointment of a testamentary guardian.

When the want of mental capacity to make a will, is urged as the ground of objection to the probat of a nuncupation, it is the duty of the party offering such will, to prove such capacity by the clearest testimony.

Where the testimony leaves the mind in a state of doubt as to the capacity of the testator to make a nuncupative will, it is the duty of the Orphans' court not to admit it to probat.

Where a nuncupative will is drawn from the decedent by interrogatories, full and clear proof of spontaniety of the *animus testandi* is indispensible.

APPEAL from the *Orphans'* court of *Calvert* county.

*Caveat* by the appellees against the admission to *probat* of the nuncupative will of *Hezekiah Coberth.*

The appellant moved the court to admit the testimony of the subscribing witnesses to a paper or instrument of writing, purporting to be the nuncupative will of *H. Coberth,* deceased, and which paper was as follows :

"We, the undersigned, certify, that *Mr. Hezekiah Coberth,* "on the morning of the 28th October, 1841, said in our pre-

"sence, that he wished *Dr. George W. Dorsey* to act as trustee "for his son, to be his administrator, and to use his own words, "he wished him to be his general agent; he moreover said, he "intended it to be his last will. J. A. SEDWICK,

> LOCH L. WEEMS,
> JAMES WILLIAMS,
> JAMES M. SOLLERS."

To this paper was attached an affidavit, made before two justices of the peace of *Calvert* county, by all the witnesses thereto, that the deceased did make the above statement in their presence, and at the time of making the same, he was of a sound and disposing mind, to the best of their knowledge and belief.

The paper and deposition were offered for the purpose of proving as well what was the last will and testament of the deceased, as for explaining the said paper.

The caveators objected—

1. That the said paper was not in the form required by law.

2. That it cannot be construed as the appointment of a guardian or executor.

3. That the same is not attested and proved according to law.

4. That the same was procured at the instance, and by the solicitation, importunities, and request, of persons present at the time, which the testator was too weak to resist.

The *Orphans'* court, after hearing both parties, ordered the prayer of the motion to be granted, and then proceeded to take the following proof:

The deposition of *Dr. John A. Sedwick,* of lawful age, after, &c., deposeth and saith, that the morning on which *Mr. Hezekiah Coberth* died, he, together with *Dr. L. L. Weems,* as attending physicians, thought it their duty to suggest to *Mr. Hezekiah Coberth,* that if he wished to make any arrangement of his affairs, that was the proper time, as he had no time to lose, they having understood that he intended to do so; when he replied, that he wished to make some arrangement, but wanted some little rest before doing so, and after be-

ing reminded by *Dr. L. L. Weems*, that if he wished to do any thing respecting his affairs it could be made valid.    *Mr. Hezekiah Coberth* then cast his eyes around and called for *Dr. George W. Dorsey*, the individual mentioned in the paper purporting to be his nuncupative will.    We thought he was about to speak, but he did not at that moment.    He, the deponent, then asked *Mr. Hezekiah Coberth* if he wished *Dr. George W. Dorsey* to take care of his child, and at the same time asked *Mr. Hezekiah Coberth* if he wished him, *Dr. Dorsey*, to be trustee to his child, and he answered in the affirmative to both. This deponent then asked him if he wished *Dr. George W. Dorsey* to be his administrator, to which he answered yes, and added, general agent.    There was then a little pause, after which *Dr. L. L. Weems* asked if he wished it to be his last will, to which he first nodded assent, and afterwards said yes, which was said distinctly, and emphatically spoken.    This deponent further says, that *Dr. George W. Dorsey* is the same individual mentioned in the paper referred to.    This deponent further says, that the reason why he mentioned this subject to *Hezekiah Coberth* was, his having heard him during his illness express a wish to make some arrangement respecting his affairs; that they were not at that time as he wished, and that he wished that they, *Dr. L. L. Weems* and himself, should do something for him, as he wished to recover or recruit, to make some arrangements; and that at the time he, *Mr. Hezekiah Coberth*, made this declaration, he was perfectly sane, and the aforementioned words, purporting to be his last will, were spoken by *Mr. Hezekiah Coberth* in the presence of him the deponent, *Dr. L. L. Weems, James M. Sollers* and *James Williams*; and that they were spoken in his last illness and in his own house and place of residence; and that he this deponent was called to *Mr. Hezekiah Coberth*, Saturday previous to his death, and that the words expressive of a disposition to make some arrangement were spoken a part on Monday and a part on Tuesday or Wednesday; and further this deponent saith not.

Deposition of *Dr. Loach L. Weems*, of lawful age, being

duly sworn on, &c., deposeth and saith, that he was called to see *Mr. Hezekiah Coberth* on Monday afternoon about two o'clock. On Thursday morning he found him in a dying condition, but perfectly rational. He this deponent stated to *Dr. John A. Sedwick*, that it was his duty to ask *Mr. Hezekiah Coberth* if he did not wish to make some arrangement, and that *Dr. John A. Sedwick* mentioned this to him, and *Mr. Hezekiah Coberth* replied, that he wanted about one hour's rest, that he was very much fatigued. This deponent then observed that if he, *Mr. Coberth*, wished to make any provision for his little son, that was the time, and rest afterwards. He, this deponent, further stated to *Mr. Hezekiah Coberth*, that any arrangement that he wished could be attended to for him afterwards, and that *James M. Sollers* and *James Williams* then assembled around his bed, and that this deponent and *Dr. John A. Sedwick* were already at the bedside. That *Dr. George W. Dorsey* came to the bedside also, and that he is not satisfied that he was called by *Mr. Hezekiah Coberth* or not; that then *Mr. Hezekiah Coberth* took hold of *Dr. George W. Dorsey's* hand; he then asked him if he wanted him, and *Mr. Hezekiah Coberth* then stated, using his own phrase, I wish you to be trustee to my little son and my general agent. He this deponent then asked *Mr. Hezekiah Coberth*, whether, in the event of its being necessary, did he wish *Dr. George W. Dorsey* to administer on his estate, to which he replied yes, and general agency. *Dr. John A. Sedwick* then asked him whether he wished us the said witnesses, to witness this to be his last will and testament. He first gave assent by nodding his head, and then said, I do; and that he, this deponent, was certain that *Mr. Hezekiah Coberth* heard them, and that the words aforesaid were spoken in his last illness, and in his own house and his place of residence, and in the presence of this deponent, *James M. Sollers*, *Dr. John A. Sedwick* and *James Williams*, who were all standing around his bedside at the time. And the said deponent further saith, that *Dr. George W. Dorsey* married the daughter of *Hezekiah Coberth*, deceased, which daughter died without issue previous to the

death of the said *Hezekiah Coberth*, and the said *Hezekiah Coberth* had a peculiar way of expressing himself; and further this deponent saith not.

The deposition of *James M. Sollers*, after, &c., deposeth and saith, that he was sent for by *Dr. George W. Dorsey* to see *Mr. Hezekiah Coberth*. After being there some time *Dr. L. L. Weems* and *Dr. John A. Sedwick* came in some time after they had been there. *Dr. John A. Sedwick* asked *Mr. Hezekiah Coberth* if he did not wish to see *Mr. James A. Bond* to do some writing or business for him; he answered he did, but he wished some rest. *Dr. L. L. Weems* then said to *Mr. Hezekiah Coberth*, you had better say what you wish to say and rest afterwards. He *Mr. Hezekiah Coberth* then looked round and asked for *Dr. George W. Dorsey*, who was at that time setting on the small bedside; he arose and went to the bedside of *Mr. Hezekiah Coberth*, and he then reached out his hand and caught *Dr. George W. Dorsey* by the hand; he then asked what he wanted, and he said he must rest. *Dr. L. L. Weems* then said to *Mr. Hezekiah Coberth*, I would not put it off, sir; whatever you wish to say, say it in our presence and it shall be attended to. He then said something in an indirect tone which he this deponent did not understand. *Dr. L. L. Weems* then asked *Mr. Hezekiah Coberth* if he wished *Dr. George W. Dorsey* to be guardian to his little son, and his reply was yes, distinctly; and after some pause he *Mr. Hezekiah Coberth* said general trustee; and he was then asked by *Dr. L. L. Weems* if he wished *Dr. George W. Dorsey* to administer on his estate, and he then replied yes; and after a pause, my general agent. And *Dr. John A. Sedwick* then asked *Mr. Hezekiah Coberth* if he wished us, the witnesses, to consider this his last will and testament. He *Mr. Hezekiah Coberth* then nodded his head and said yes; and that *this* conversation was during the last illness of *Mr. Hezekiah Coberth*, and at his house and his place of residence, and in the presence of this deponent, and *James Williams*, *Dr. John A. Sedwick* and *Dr. L. L. Weems*, all of whom were standing around his bedside at that time. This deponent believes that *Mr. Hezekiah Coberth* was rational at the time; and further this deponent saith not.

The deposition of *James Williams*, after, &c., deposeth and saith, that on Thursday morning he visited *St. Leonards*, and hearing of *Hezekiah Coberth's* illness, he went to see him, when *Dr. Loch L. Weems*, who was then present at the time, said to *Mr. Coberth*, whilst he this deponent was present, that any request that he *Mr. H. Coberth* would make before these gentlemen would be just as good as a will, and *Mr. Coberth* replied yes. *Mr. Coberth* then called for *Dr. George W. Dorsey*, and the *Doctor* then took hold of his hand; when *Dr. John A. Sedwick* or *Dr. Loch L. Weems* asked *Mr. Coberth* if he wished *Dr. George W. Dorsey* to take care of his child, or to be his administrator; and at the same time *Dr. Loch L. Weems* asked *Mr. Coberth* if he considered that to be his last will and testament, and he nodded assent and said yes; and that the words purporting to be his last will were spoken during the last illness of *Mr. Coberth*, and at his house, and in the presence of this deponent, *Dr. John A. Sedwick*, *Dr. Loch L. Weems* and *James M. Sollers*, who were all standing around his bedside at the time, in his house and his place of residence; and further this deponent saith not.

The deposition of *Thomas Edmonds*, after, &c., deposeth and saith, that he knew *Ann* and *Elizabeth Coberth* to be sisters of the half-blood to *Hezekiah Coberth*; and that they removed to the city of *Annapolis* some years ago; and that one of them married a *Mr. Sears*, and the other a *Mr. McNeir*; and further this deponent saith not.

The deposition of *Jesse J. Dalrymple*, after, &c., deposeth and saith, that he heard *Mr. H. Coberth*, in his life time say, that the mother of the *McNeir's* was his sister; and further this deponent saith not.

The deposition of *William H. Tuck*, after, &c., deposeth and saith, that he knew *Basil Sheppard* and *Elizabeth*, his wife, of *Annapolis*; and that *Elizabeth Sheppard* is the mother of *George* and *William McNeir*, both of whom he has heard say that their mother and *Mrs. Ann Sears* are sisters of the half-blood of the late *Hezekiah Coberth*; and further this deponent saith not.

The orphans court having heard the parties by their counsel and duly considered the testimony in the case, do adjudge, order and decree, that the said paper offered for probat as the nuncupative will of the said *H. Coberth*, be and the same is hereby rejected, and ordered not to be admitted to probat as his will.

From which decree the said *George W. Dorsey* appealed.

It was agreed in the appellate court to amend the record so as to show that it was in proof in the orphans court, that the deceased *Coberth*, died possessed of personal property of the value of several thousand dollars.

The cause was argued before BUCHANAN, C. J., STEPHEN, DORSEY, CHAMBERS and SPENCE, Judges.

By SOLLERS and S. PINKNEY for the appellant, and
By TUCK and ALEXANDER for the appellees.

DORSEY, J., delivered the opinion of this court.

Nuncupative wills, though tolerated, are by no means favorites of the law. Independent of the statute of frauds altogether, the *factum* of a nuncupative will requires to be proved by evidence more strict and stringent, than that of a written one in every single particular. This is requisite in consideration of the facilities with which frauds in setting up nuncupative wills are obviously attended. Facilities which absolutely require to be counteracted, by courts insisting on the strictest proof as to the *facta* of such alleged wills. Hence the testamentary capacity of the deceased, and the *animus testandi* at the time of the alleged nuncupation, must appear, in the case of a nuncupative will, by the clearest and most indisputable testimony. See *Lemarna vs. Bonsall*, 2 *Eng. Eccl. Rep.* 147. 1 *Williams on Executors*, 62, and the case of *Priscilla E. Yarnall's will*, 4 *Rawle's Rep.* 62. A will made by interrogatories is valid; but undoubtedly, whenever a will is so made, the court must be more upon its guard against importunity, more jealous of capacity, and more strict in requiring proof of spontaniety and volition, than it would be in an ordinary

case. 1 *Eng. Eccl. Rep.* 32, *Green vs. Skipworth and others.* According to these sound and well-established principles, let us proceed to the examination of the case before us: first, premising that no bequests having been made by the alleged nuncupative will, it is not subject to the operation of the statute of frauds in relation to such testaments; nor to that of the act of Assembly of 1810, chap. 34. The only effect of the will, if admitted to probat, and it were competent to effectuate the supposed intent of the testator, would be to secure to the appellant the appointment of executor or administrator of the deceased, and the guardianship of his only child. The latter object, however, could not be accomplished; a written will being made indispensible for such a purpose, by the statute of 12 *Car.* 2, *chap.* 24.

To the admission to probat of the will in question, a number of objections were interposed in the orphans court, most of which we deem it unnecessary to examine. That on which we think the decision of the cause mainly depends, as far as such objections are concerned, is the allegation of the appellees, that the will, attempted to be proved, was not the voluntary act and free will of the deceased, but he was induced to speak of his affairs, as mentioned in said paper, by the suggestion of others, only a short time before his death, and when he was not in a mental or physical condition to make a will, or execute a valid deed or contract; and that in the situation in which he was placed, and the circumstances connected with the execution of said paper, he was too weak to transact business, or to resist the suggestions that were made to him, of the necessity of making a will; and said words, attributed to the deceased, were used by him in consequence of the undue influence of said suggestions. To establish the will, the appellant produced four witnesses, being the only persons, except himself, who appear to have been with the deceased at the time it is alleged to have been made. Two of those were the attending physicians; one a person sent for by the appellant, and the fourth an accidental visitor. The orphans' court proceeded to take their testimony; and as respects the sanity of

the decedent, what have they testified? The first witness *Dr. Sedwick*, after detailing what he alleged as having occurred on the morning of the making of *Coberth's* testament, and of his death, proceeds thus: "this deponent further says, that the reason why he mentioned this subject to *Hezekiah Coberth* was, his having heard him, during his illness, express a wish to make some arrangement respecting his affairs; that they were not at that time, as he wished; and that he wished that they, *Dr. L. L. Weems* and himself, should do something for him, as he wished to recover and recruit to make some arrangements; and that at the time he *Hezekiah Coberth* made these declarations, he was perfectly sane; and that the aforementioned words, purporting to be his last will, were spoken by *Mr. Hezekiah Coberth* in the presence of him the deponent, *Dr. L. L. Weems*, *James M. Sollers* and *James Williams;* and that they were spoken in his last illness, and in his own house and place of residence; and that he this deponent was called to *Mr. Hezekiah Coberth*, on Saturday previous to his death; and that the words, expressive of a disposition to make some arrangement, were spoken a part on Monday, and a part on Tuesday or Wednesday." The deceased died on Thursday morning, as proved by *Dr. Sedwick*. He gives no testimony as to the sanity of the mind of the decedent, at the time of the nuncupation in question, but confines his evidence on this subject, to its state some one, two or three days before. *Dr. Weems* states that, "on Thursday morning he found him (*Coberth*,) in a dying condition, but perfectly rational." *James M. Sollers* says, "he believes that *Mr. Hezekiah Coberth* was rational" at the time of the alleged nuncupation. But what degree of rationality was meant by the witness? Whether a mere exemption from delirium, or such a degree of intellect as would enable its possessor to make a valid deed or contract, or a reasonable or sensible disposition of his property, does not appear. *James Williams*, the remaining witness, gives no testimony as to the sanity of the deceased. When then we advert to the fact, that the want of mental capacity in the deceased, was a ground of objection to the probat; that, independently of

such objection, it was the duty of the appellant to prove such capacity by the clearest and most indisputable testimony; that of the four witnesses to the will, but two of them testify as to such capacity; that he who does so most strongly, says, that when he visited *Coberth*, on the morning of the alleged nuncupation, (which was the morning of his death,) he found him in a dying condition; that all the facts given in evidence by the witnesses as to the conduct of the deceased, and those around him, during the time of the alleged nuncupation, leave upon the mind doubts as to the mental capacity of the testator. We think the orphans court were right, upon that ground, in refusing to admit to probat the proffered nuncupative will. We think, too, looking to all the proof in the cause, and the manner in which, by interrogatories, the alleged nuncupation was drawn from the decedent, that there was not such proof of spontaniety, and of the *animus testandi* as is indispensable to the validity of such a will. The only reported case, which we have met with of a will made by interrogatories to the testator, is that of *Green vs. Skipworth and others*, 1 *Eng. Eccl. Rep.* 32: at which it is only necessary to glance for a moment, to see that its admission to probat stands upon grounds infinitely stronger than could be urged in favor of that now under consideration. To grant probat to the will now before us, would, in our opinion, establish a precedent fraught with the most dangerous tendency.

THE DECREE OF THE ORPHANS COURT IS AFFIRMED

WITH COSTS.