# SLACK *v.* PERRINE.

RES JUDICATA; HABEAS CORPUS; STATE COMITY; COLLATERAL
    ATTACK; FOREIGN DECREES; EXTRA-TERRITORIAL EFFECT OF
    TESTAMENTARY GUARDIANS.

1. *Quære*, whether the statute of 12 Charles 2, Ch. 24, Sec. 8, is
    in force in this District to the extent that the father of infant
    children may by deed or will transfer their exclusive custody
    and control to a guardian, regardless of the fact that their
    mother, his wife, may be competent, willing and in all respects
    qualified to maintain, educate and train them properly. (The
    Chief Justice in a dissenting opinion holds that such statute is
    in force here.)
2. A former adjudication upon the question of the right to the cus-
    tody of infants in a *habeas corpus* proceeding by a court of
    record having jurisdiction of the subject matter and of the
    parties, may be pleaded as *res judicata* and is conclusive upon
    the same parties upon the same state of facts.
3. And in such a case the principle of *res judicata* applies with stronger
    reason where the former decree was rendered by a court hav-
    ing in addition to concurrent jurisdiction with courts of law
    in *habeas corpus* proceedings, general jurisdiction as an equity
    court over infants.
4. A decree of a court of chancery in a foreign jurisdiction, having
    by statute concurrent jurisdiction with courts of law in *habeas
    corpus* proceedings, is to be given in such a case the same ef-
    fect here as in the jurisdiction where rendered.
5. Where infant children of a father and mother, who were residents
    of this District, but had separated, were taken to New Jersey
    at the request of the father, who was temporarily stopping
    there, and placed there with his relatives, the courts of that
    State had jurisdiction to determine, in a *habeas corpus* pro-
    ceeding brought by the mother after the father's death, to
    whom the custody of the children rightfully belonged, and the
    decree there rendered is binding in a *habeas corpus* proceeding
    here between the same parties, although the children were re-
    moved to this District before the rendition of such decree.
6. This court in such a proceeding will not declare unconstitutional
    a statute of New Jersey creating the office of vice chancellor
    in that State, upon the ground that the constitution of that
    State makes no provision for such an office, where the statute

has been in force twenty-five years and its constitutionality continuously upheld, especially where the decree in that State, which is attacked here, was the result of a reference of the cause by the chancellor to the vice chancellor for hearing, and when rendered was signed by both.

7. Nor will such a decree be held invalid here upon the ground that by statute in New Jersey the power to grant a writ of *habeas corpus* there is in the vice chancellor, and the cause should have been heard by him without the intervention of the chancellor or court of chancery ; especially where the petition for the writ, although addressed to the vice chancellor, was filed in the chancery court and all subsequent proceedings were of record in that court.

8. Irregularities in such a decree and in antecedent proceedings will not affect its validity as a decree of the court of chancery, upon a collateral inquiry.

9. Whether a decree in a *habeas corpus* proceeding in New Jersey wherein the right to the custody of infants is contested between their mother and their testamentary guardian, and is decided in favor of the mother, is erroneous or not, it remains a bar, until set aside or reversed, to the assertion of any claim here by the testamentary guardian against the parent.

10. Where subsequent to the rendition of such a decree in that State the children are removed to this District, although that decree is binding upon such contestants, the rights of the infants will not be affected thereby ; and the courts here will see that they are afforded necessary care and protection.

11. Where in a *habeas corpus* proceeding here to determine to whom the custody of certain infants rightfully belongs, the answer of the respondents denies the jurisdiction of a foreign court which had previously adjudicated the same question, a demurrer to the answer will not amount to an admission of the want of jurisdiction of such court, but will raise the question of law whether or not that court had jurisdiction.

No. 556.   Submitted May 15, 1896.   Decided June 2, 1896.

HEARING on an appeal by the petitioner from a judgment dismissing her petition for a writ of *habeas corpus.* *Reversed.*

The COURT in its opinion stated the case as follows:

This appeal is from a judgment discharging a writ of *habeas corpus* that had been issued on a petition filed by

Mary Kemble Slack against Lewis Perrine and Harriet Addie Slack Perrine to recover the possession of her two infant children, Mary Juliet Gerard and Katharine Addie Slack.

The petitioner alleged that she is the widow of William Hall Slack, formerly of the District of Columbia, who resided the last year of his life in the State of New Jersey and died therein October 2, 1895. The two children aforesaid of the age of ten and eight years, respectively, were born of the marriage.

In October, 1894, at the request of her husband, who was living apart from her, she sent the children to pay him a visit at the home of the defendants, in Trenton, New Jersey, and they were there detained. Having demanded the said children from defendants after the death of their father, and having been refused their custody, and even the privilege of seeing them, a petition for *habeas corpus* was filed against defendants in the Court of Chancery of the State of New Jersey on October 9, 1895.

The writ was issued and the children produced in court, and, by consent of parties, they were given in charge of defendants pending the proceedings.

Return was made to said writ by defendants and depositions were taken to be used at the hearing of the case on November 26, 1895.

In violation of the duty imposed on them by said court and in contempt thereof, defendants, about November 23, brought the children to the District of Columbia, where they now are. On November 26, the said court proceeded to hear the case and rendered a decree to the effect that petitioner was entitled to the permanent custody and control of said children, and ordered that they be delivered to her. A duly certified transcript of the proceedings in the court of New Jersey was made an exhibit to the petition.

It appears from the answer of defendants therein that they alleged in reply that William Hall Slack was domiciled

in the District of Columbia and only sojourning in New
Jersey, where he died; that William Hall Slack, by virtue
of the laws of the said District, had the legal right to dis-
pose of the guardianship of his minor children by deed or
will; that by will, duly attested, he created one of the re-
spondents, Harriet Addie Slack Perrine, who was his sister,
guardian of said children until they should arrive at the
age of twenty-one years or marry; that on October 5, 1895,
the will aforesaid had been filed in the Probate Court of
said District in order to have the same duly probated; that,
by virtue of said will she is the legal guardian and as such
entitled to the custody of said children; that they prefer
to remain with her and it is to their benefit to do so because
their said mother is not a fit and proper person for the
custody of young female children; that she has "for many
years been a woman of intemperate habits, habitually
addicted to the use of intoxicating liquors, frequently be-
coming drunk and intoxicated by reason thereof; that
she is a person of violent temper and addicted habitually
to the use of most profane, lewd, and indecent language,
and has conducted herself, both in private and public, in a
lewd and indecent manner."

There were some further specific allegations of acts of
intoxication and adultery in the month of April, 1894. An
exhibit to this answer is made of a bill filed in the Supreme
Court of the District of Columbia, September 24, 1895, by
Mary Kemble Slack against her husband, William Hall
Slack, in which she charged his and her own residence to
be in the said District.

The bill was one for alimony and custody of the children,
and purported to give a history of domestic difficulties,
estrangement, and so forth, to date. No service was ever
had upon this bill.

The answer also denied the jurisdiction of the chancellor
to determine the question of the legal right to the custody
of the said children.

A motion was made by the respondents for a postponement of the hearing, which was overruled November 21, 1895, by the vice chancellor for the reasons given in a brief opinion, as follows:

"JULIAN GERARD BUCKLEY, Petitioner,

*v.*

" LEWIS PERRINE ET AL., Respondents.

" ON motion to postpone hearing.

"BIRD, V. C.: When I consider that this litigation may be somewhat protracted, and also the relation of the petitioner to these children and her legal right to their custody and the character of the charges made against her, I feel it my duty to deny the motion to postpone the hearing of this cause. I at first thought differently, but only so because of the disinclination of courts to hear causes by halves.

"But when I come to consider the rights of parents in all such controversies, it becomes very apparent that the qualifications of the petitioner to perform the duties of a mother might have such an important influence upon the court pending the controversy that so far as the pleadings raised the question respecting such qualifications the determination thereof should not be delayed. The impression of counsel for the motion that the infamy connected with the case ought not to have further publicity is not sufficient in itself to warrant the court in granting the motion. It may be doubtful whether such publicity can be any more extensive than telegrams and newspapers have already extended it.

"But, above all, as the petitioner has come into this court, asking the custody of the children, it becomes the duty of the court, since her character has been assailed, to inquire with respect to that matter; for it would seem that if she be a fit person, being the mother, she has the legal right to the custody of her own offspring until a superior legal right is established in another."

On November 25 the cause was referred to said John T. Bird, vice chancellor, "to hear the same for the chancellor

and to report thereon to him and advise what order or decree should be made therein," by an order signed by Alexander T. McGill, chancellor.

The petition for *habeas corpus* had been filed in the Court of Chancery, but had been addressed to said John T. Bird, vice chancellor, and by him granted.

The final decree awarding the custody of the children to petitioner was filed in the Chancery Court, and is signed thus:

"Respectfully advised.
          "JOHN T. BIRD, V. C.      ALEX. T. McGILL, C."

To this petition and writ of *habeas corpus* in the District of Columbia Mrs. Perrine filed an elaborate return. She alleged that she had custody of the children as testamentary guardian under the will aforesaid of their father; that children and parents had always had their domicile in the District of Columbia; that the will aforesaid had been filed for probate October 5, 1895, and a *caveat* had been filed against it by Mary Kemble Slack, November 14, 1895. Upon a trial of the issues the will had been sustained and duly probated January 13, 1896, and respondent thereby appointed guardian, and the adjudication was conclusive of her rights thereunder. The answer further attacks and denies the jurisdiction of John T. Bird to entertain the proceedings or to make or recommend a decree as set out in the certified transcript of the proceedings in New Jersey, made an exhibit to the petition.

The charges of lewd conduct, intoxication, and so forth, made in the answer to the petition in the Chancery Court of New Jersey, are substantially repeated.

She further alleged that on November 26, 1895, the infants, by their grandfather, William B. Slack, as next friend, filed a bill in the Supreme Court of the District, in equity, against Mary Kemble Slack, " to enjoin her from instituting, prosecuting, or defending in this or any other jurisdiction

any proceedings affecting the custody and tuition of said infants pending the contest over the will of their said father," etc.

This bill, with all the proceedings in the said cause No. 16,976, was made an exhibit to the answer. It contained a statement of substantially the same matters set out in the said answers of Harriet Addie Slack Perrine, and was accompanied by affidavits concerning the alleged immoral conduct of Mary Kemble Slack. The answer of said Mary Kemble Slack thereto, contains a denial of all the allegations of that bill, accompanied by affidavits denying the charges against her, and sets out the proceedings in the Chancery Court of New Jersey as a bar. Harriet Addie Slack Perrine, who had made herself a party to the cause, also filed an answer in which she attacked the jurisdiction of the New Jersey court. Some other matters were alleged touching the *habeas corpus* proceedings in the first case and the right of Mary Kemble Slack to maintain the same and so forth. William B. Slack having died, William A. Gordon, Esq., was duly appointed next friend in his stead. The opinion of Mr. Justice Hagner on the motion for the preliminary injunction, pending the proceedings in the contest of the will of William H. Slack, is made an exhibit also. The learned justice sustained the claim of Mrs. Perrine that the statute of 12 Charles 2, Ch. 24, Sec. 8, is in force in the District of Columbia, and that thereunder William Hall Slack, the father of the infants, had the right to appoint a guardian by will to have the custody and control of them until arrival at the age of twenty-one years. He also denied the effect claimed for the decree of the Chancery Court of New Jersey as *res judicata.* He therefore awarded an injunction as prayed, pending the contest of the will, but ordered that the mother should be permitted to visit the children regularly until an end of the litigation. It may be here remarked that some subsequent proceedings were had in that cause, and this court has granted an appeal from an interlocutory

order filed therein, which was heard in connection with this cause. The proceedings in this cause before Hon. L. E. Mc-Comas, Justice, were stayed by him to await action by Mr. Justice Hagner in the said equity cause.

On February 5, 1896, and in deference to the opinion of Mr. Justice Hagner, mentioned above, Mr. Justice McComas, without expressing an opinion himself, overruled the demurrer of petitioner to the return of the respondents and discharged the writ of *habeas corpus* that had been issued. From that judgment this appeal has been taken.

*Mr. A. S. Worthington, Mr. George E. Hamilton* and *Mr. Julian Gerard Buckley* for the appellant:

1. The decree of the Court of Chancery of the State of New Jersey awarding the custody of the infants to the appellant is conclusive in the District of Columbia, and, when sued upon in the courts here, it should be followed and enforced.

The proposition of law upon which the appellant relies to sustain her appeal under this portion of the argument is that the decree of the Court of Chancery of New Jersey is conclusive until reversed on appeal, not only in all parts of the State of New Jersey *ipso facto*, but also in every part of the United States when sued upon and sought to be enforced by the proper tribunals. Const. U. S., Art. 4, Sec. 1, Subd. 1; Story on the Constitution, Sec. 1309; Sec. 905, R. S. U. S.; *Railroad Co.* v. *Gorman*, 7 App. D. C. 91; *Zimmerman* v. *Helser*, 32 Md. 274; *D'Arcy* v. *Ketchum*, 11 How. 171.

It was clearly held in the following cases that the decree of a court of competent jurisdiction cannot be collaterally attacked, but that the only manner to review the same is by appeal. *White* v. *Crow*, 101 U. S. 181; *Central Trust Co.* v. *Seasongood*, 130 U. S. 482.

In the case at bar a simple reference to the record of the proceedings in the Court of Chancery of the State of New Jersey discloses what issues were therein joined and decided. The appellant in these proceedings contended that

she was entitled to the care and custody of her children as being their guardian by nature. The appellees opposed the writ of *habeas corpus* on the ground that the title of the appellee, as guardian appointed by the will of William H. Slack, deceased, was superior to the claim of all persons, even including the mother of the children, and that the appellant, their mother, was not a fit and proper person to have their care and custody. The first was an issue of law, the second of fact. The pleadings show that such were the issues, and both were adjudicated by the Court of Chancery of the State of New Jersey, as appears by the recitals in its decree. These issues were therefore *res judicata*, and it was manifestly improper and without warrant of law to disregard the adjudication of the Court of Chancery of New Jersey by the courts of the District of Columbia.

It cannot be contended that the judgment of the Court of Chancery of the State of New Jersey was not valid because the same was rendered without the presence of the appellees or because they were not represented by counsel. The record shows that the counsel withdrew at their own request, as their clients had practically abandoned the defence of the proceedings in *habeas corpus* in New Jersey and fled to another jurisdiction.

No one can object to a judgment which he permitted to be rendered through his own carelessness, negligence, or ignorance. *Smith* v. *Smith,* 79 N. Y. 634; *Davies* v. *Mayor,* 93 N. Y. 250; *Pray* v. *Hegeman,* 98 N. Y. 351. Judgment by confession or consent, if given intelligently and voluntarily and without collusion or fraud, is conclusive. *Railroad Co.* v. *United States,* 113 U. S. 261; *United States* v. *Parker,* 120 U. S. 89. A judgment is none the less conclusive because rendered by default. *Cromwell* v. *Co. of Sac,* 94 U. S. 451; *Loney* v. *Bailey,* 43 Md. 10; *Harshman* v. *Knox* Co., 122 U. S. 306. The question as to what effect should be given by the courts of one State to the judgments of the courts of another State has arisen in many instances in cases of divorce.

Where a mother has obtained a judgment of divorce in one State, awarding to her the custody of her children or directing the payment of alimony, and the husband has taken the children to another State, or, having removed himself there, refused to pay alimony, the courts of the latter State have uniformly upheld the judgment of the former State awarding the decree of divorce. *Bennett* v. *Bennett,* 29 Myers' Fed. Dec. 705 ; see also Bishop on Marriage and Divorce, 1891, Sec. 1189 ; *Kinnier* v. *Kinnier,* 45 N. Y. 535 ; *Shattenkirk* v. *Wheeler,* 3 Johns. Ch. 276 ; *Bicknell* v. *Field,* 8 Paige, 445 ; *Dobson* v. *Pierce,* 12 N. Y. 156 ; *Rugel* v. *Heckel,* 21 Hun, 481 ; *Coddington* v. *Coddington,* 10 Abb. Pr. 450 ; *People* v. *Allen,* 40 Hun, 611 ; *Smith* v. *Smith,* 79 N. Y. 634 ; *Rich* v. *Rich,* 88 Hun, 566 ; Church on Habeas Corpus, Sec. 451, p. 729.

This court has distinctly held that only where there is a defect of jurisdiction in the first instance will the proceedings not bind the parties thereto. *Railroad Co.* v. *Gorman,* 7 App. D. C. 91. Such a contention cannot well be made in the case at bar. There can be absolutely no question as to the jurisdiction which the Court of Chancery of New Jersey obtained over both the appellees and the infants themselves. The writ of *habeas corpus* was duly ordered to issue by Vice Chancellor Bird, a judicial officer of the Court of Chancery of New Jersey, having full authority to direct that this writ be allowed. It was issued by the clerk of the Court of Chancery of the State of New Jersey under the seal of that court and served upon the appellees by the proper officer within the State of New Jersey. This appears by the indorsement on the writ set forth in the record ; and the recitals of the various orders made in the course of the proceedings cannot be controverted here.

If there were at any time any question as to the jurisdiction of the Court of Chancery of New Jersey over the persons of the appellees, or the power of that court to render the decree which was made, they waived the same when

they appeared before that court in response to the writ and produced the infants and made their return.  If they desired to raise any such question, it should have been done upon the return day named in the writ; the appellees should then have made a special appearance for the sole purpose of raising this question.  They failed to do this, however, and lost their opportunity forever to contest this matter.  This view was clearly recognized in the recent case of *Laing* v. *Rigney,* 160 U. S. 531, under somewhat similar circumstances.

If this court should be of opinion, after an examination of the authorities which have been cited, including its decision in the case of *Railroad Co.* v. *Gorman,* that Mr. Justice Hagner was correct in ruling that the collateral attack against the decree of the Court of Chancery of New Jersey could be lawfully made, nevertheless the appellant insists that such an attack ought not to be sustained.  The only ground on which this collateral attack against the decree of the Court of Chancery of New Jersey is made is that the constitution of that State provides that the Court of Chancery shall consist of a chancellor, and that thus there is no warrant for the creation by the legislature of an officer to conduct its business other than a chancellor, and that consequently there is no such judicial officer as a vice chancellor, and any proceedings held before him are void and of no effect. Vice chancellors have been in existence in the Court of Chancery for the State of New Jersey for more than twenty years and effect has always been given to their decisions unless reversed by the Court of Errors and Appeals of that State.  Their right to administer the laws of the State of New Jersey by virtue of the constitution has been uniformly recognized by the Court of Errors and Appeals, which has held that when a cause was heard by a vice chancellor without objection and the chancellor adopted his advice and signed a decree, it was too late, even

on appeal, to raise the question of the vice chancellor's right to hear the cause. *Railroad Co.* v. *Markley*, 18 Stew. 139.

The writ of *habeas corpus* is a process of the court. It is manifest that whatever irregularities may occur, either in the form of the process or in the manner of the service, may be waived by the defendant's appearance; indeed, service itself may be entirely waived. Am. and Eng. Ency. of Law, Vol. 22, p. 168, note 2, and cases cited; see *Murat* v. *Hutchinson*, 1 Harr. 46; *Palmer* v. *Sanders*, 22 Vr. 408; *Clifford* v. *Overseer*, 8 Vr. 152. Besides all this, process is amendable, and that at any time. *Wesson* v. *Stalker*, 47 L. T. 444; *Pleasants* v. *East Derdiam*, 47 L. T. 439.

The statute of New Jersey creating the office of vice chancellor provides that the chancellor may refer to him any matter pending in the Court of Chancery. The power of the chancellor to refer under this section is untrammeled. The rule of the Court of Chancery (No. 193) which says that a reference to a master may be made upon the application of either party upon five days' notice to the other is one made by the court for the guidance of counsellors and suitors, but is a regulation that may be dispensed with by the court. *United States* v. *Breitling*, 20 How. 252. The granting of the order of reference in this case by the chancellor without requiring notice was a construction by him of the force and effect of this rule, and in general the construction of its own rules by a court of original jurisdiction is conclusive. Am. and Eng. Ency. of Law, Vol. 4, p. 51. To except any given case from the ordinary rules of the court is to make a special rule in that particular case. This was done in *Deeming* v. *Foster*, 42 New Hampshire, 165. See also *Pickett* v. *Wallis*, 54 Cal. 147; *United States* v. *Breitling, supra.*

But as this matter was pending before the vice chancellor in his statutory jurisdiction to afford relief in *habeas corpus,* and as the appellees themselves raised the issue touching the permanent custody of the infants, and thus invoked the general jurisdiction of the court, the purposes of justice re-

quired and were met by the reference of the cause to the vice chancellor that he might be clothed with the power to take cognizance of the whole case and advise the chancellor what decree should be made therein.

This controversy was begun before the vice chancellor in his special statutory jurisdiction on *habeas corpus,* but by the issues in the pleadings, raised by the appellees themselves, the question touching the permanent custody of these children was addressed to the general jurisdiction of the court as *parens patriæ.* This issue having been raised, it was meet and proper that it should be decided in this controversy, rather than that a decision should be made which would only relieve from restraint and give the temporary custody to the mother, or *vice versa,* and therefore it was that the chancellor himself referred the case to the vice chancellor, who, having heard the same as a proceeding pending in the Court of Chancery referred to him, advised the chancellor to make an order and decree in the case which fixed the status of the infants during their minority, and awarded their permanent custody to the mother on the merits. This disposition of the matter is supported by *Richards* v. *Collins,* 18 Stew. 286.

The writ issues out of the Court of Chancery; it is therefore a matter pending in the Court of Chancery; the chancellor may refer to the vice chancellor any matter pending in the Court of Chancery; this matter was referred by the chancellor to the vice chancellor; and the chancellor has adopted the opinion of the vice chancellor, and signed the decree which he formulated. The jurisdiction as well as the power and authority of the Court of Chancery of New Jersey, abundantly appears on the face of the proceedings from the statutory law and the decisions of the courts of New Jersey. A recent decision of the Supreme Court of the United States has set at rest any doubt which this court might entertain on this point. *Laing* v. *Rigney,* 160 U. S. 531.

2. A proceeding in *habeas corpus* is the proper remedy to obtain the custody of children withheld from one entitled to their custody, and the doctrine of *res judicata* is applicable to proceedings in *habeas corpus*. Schouler on Domestic Relations, Sec. 248, and cases cited; Church on Habeas Corpus, Sec. 439, and cases cited. The leading case upon this point cited by the learned trial justice is the celebrated case of *Barry* v. *Mercein*, 8 Paige, 47. But this case was reversed in the Court of Errors and Appeals of New York, and the doctrine of *res judicata* was applied to the case by the appellate court, which suffered the child to remain with its mother. The doctrine of *res judicata* does apply to proceedings in *habeas corpus*, and a judgment upon a former proceeding of this nature is conclusive. *People* v. *Mercein*, 25 Wend. 64. See also *Brooke* v. *Logan*, 112 Ind. 183; *Dubois* v. *Johnson*, 96 Ind. 6; *Matter of Price*, 12 Hun, 511; *In the Matter of Da Costa*, 1 Park. Cr. R. 129; *McConologue's Case*, 107 Mass. 170; *People* v. *Burtnett*, 13 Abb. 8; *State* v. *Malone*, 3 Sneed, 413; *People* v. *Cooper*, 8 How. Pr. 288; *Lembke* v. *Bechdell*, 37 Minn. 360.

If an error were committed by the Court of Chancery of the State of New Jersey in deciding the question of the custody of these infants, the appellees could only review such error by appeal to the proper tribunal in New Jersey. They are not entitled to attack the decree of the New Jersey court in the District of Columbia collaterally and raise this issue. It is, therefore, immaterial in this court whether *habeas corpus* be the proper proceeding to try the custody of children or not. It cannot be contended that the infants themselves were not bound by the decree of the Court of Chancery of the State of New Jersey as not being parties to the record. Proceedings in *habeas corpus* in New Jersey are adjudicated entirely according to the provisions of the statutes of that State, which provide that any one can sue out a writ for one who is illegally detained.

Nor can it be contended that there has been any such

change of circumstances since the proceedings in *habeas corpus* were determined in New Jersey as will render the doctrine of *res judicata* and the conclusiveness of the New Jersey decree unavailing. There is no allegation in the return of any such change of circumstances. The appellees sought to evade the doctrine of *res judicata* by making the children themselves the complainants in the equity proceedings in the court below, but this was so palpable an evasion that this court cannot fail to notice it. In the pointed words of Lord Mansfield in *Rex* v. *Delaval*, 3 Burr. 1434: " No man can avoid seeing all this, let him wink ever so much." This suit in equity was collusive on its face.

*Mr. Jeremiah M. Wilson, Mr. Calderon Carlisle* and *Mr. Wm. G. Johnson* for the appellees:

1. Counsel for the appellees are unable to yield assent to any element of the proposition in the appellant's brief that " the decree of the Court of Chancery of the State of New Jersey, awarding the custody of the infants to the appellant is conclusive in the District of Columbia, and when sued upon in the courts here it should be followed and enforced." A decree in a *habeas corpus* case as to the custody of infants, or any other person, cannot be conclusive anywhere as to future custody. Very ready demonstration of the fallacy of the proposition can be made by illustrations from the case at bar. The only legal title of the appellee to the custody of these children is founded upon the will of her late brother, William H. Slack. Let us suppose that there was a valid proceeding in *habeas corpus* in a court of New Jersey having jurisdiction of the parties and the subject matter, and that that court had adjudged that the legal title to the custody of these children until their majority was in the appellee, and had thereupon awarded such custody to her for said period; and that thereafter the jury in a court of this District had returned a verdict against the validity of the will of said William H. Slack, and the Supreme Court

of the District of Columbia had entered judgment thereon, declaring it not to be his will. Would any one contend, and would this court hold, that the judgment of the court of New Jersey, finding the title of Mrs. Perrine under the will to be valid and awarding the custody of the children to her, could be binding in this or any other jurisdiction? Manifestly not. It would be the veriest *reductio ad absurdum.* Yet it would be the logical consequence of the principle contended for by appellant.

Furthermore, if such a judgment should have been rendered, based upon consideration of the welfare of infants, it could not be contended that once their welfare is always their welfare, and that, no matter what conditions might supervene, an adjudication by a court of one State that at that time one person is entitled to the permanent custody during minority of an infant can forever close all other courts to the investigation of the interest and welfare of that child and against releasing it from dangerous, immoral, or hurtful conditions.

It is of the essence of an adjudication in *habeas corpus* to be but temporary in its character, to deal with the present right of custody and with the present interest and welfare, and full faith and credit is given to such a judgment if it be conceded that at the time of judgment the right ef custody or the interest or welfare was as was then adjudged.

Again, the pretended judgment of the court of New Jersey adjudicating the legal right of custody in the appellant is alleged to have been rendered on the 26th of November, 1895. The legal title set up by the appellee was at that time in dispute and being litigated in a court of this District, the court of the domicile of the testator and the only court which had jurisdiction to inquire and determine as to its validity. The inability of the appellee here to show an established will of the testator might well have been the foundation of a judgment against her by a court of New Jersey, and can it then be said, if such were the case,

that upon the return of the parties to their domicile, and that of their father, and upon the termination of the litigation touching the will, and upon its final establishment by the courts of this District, by which the title to the legal custody of these minors became absolute in the appellee, that title, notwithstanding the laws and judgments in the domicile of the parties, is rendered absolutely nugatory because a court of New Jersey had, in the meantime, in a *habeas corpus* proceeding so adjudged under different conditions.

It might also be that in a proceeding in New Jersey the courts of that State might refuse to give effect to the testamentary disposition of the custody of a minor child, on the ground that it was contrary to the policy of the laws of that State, which did not permit such a disposition of a minor, and yet it could not be maintained that upon the return of the minors to their domicile and that of their father, the laws of that domicile could be denied effect, and the rights of that father under the laws of that domicile could be annulled because the court of another State had refused to give those laws and those rights effect in that other State.

Such a judgment could not be admitted to have any binding force as against the rights of the parties under the laws of this District. These illustrations make it manifest that the basis of the appellant's proposition is utterly inadmissible.

But the proposition is clearly inadmissible upon another and equally controlling principle. The very first words of that proposition, "The decree of the Court of Chancery of the State of New Jersey" are a *petitio principii*. Whether there is a decree of the Court of Chancery of the State of New Jersey is one of the very questions presented by this proceeding. Its existence is asserted in the petition. It is distinctly and unequivocally denied in the return, and the only answer to that return is a demurrer which admits that there is no such decree as is in the petition pretended, but

that the denial of that fact in the return is a legally insufficient answer to the petition. To permit a party to demur to a return, and at the same time to deny the truth of the facts set up in it, is to plunge judicial procedure into chaos.

Counsel for the appellant seem to think that because they attach to their petition what purports to be an authenticated transcript of a part of the alleged record (for it is not pretended to be the transcript of the entire record), they have thereby precluded the appellees from denying that there is any such record, and from requiring proof thereof, or even from combatting the alleged transcript filed by them.

It is a rule in the practice of law that the pleadings cannot contain the evidence and that the evidence cannot be presented until the pleadings have closed in an issue. The reason of these rules is that the pleadings may not be rendered prolix and ambiguous by the introduction of matter of evidence, which, when the issue is ascertained, may be utterly irrelevant and incompetent, and the further reason that evidence cannot be introduced into a case, except the adverse party have the opportunity to object to it, if admitted, to except to its admission, and to counteract it by other evidence. To admit the position assumed by the appellant in this case would be to hold that a plaintiff by filing with his pleading an alleged transcript of an alleged record, apparently authenticated in accordance with the act of Congress, would thereby and necessarily be entitled to a judgment without the defendant having a right to be heard.

The appellees in this case claim the right to deny, as they did and do deny, the existence of any such record as that pretended by the appellant in her petition for *habeas corpus.* And they claim and demand the right, if the existence of such a record is to be given any force in this proceeding, to have the existence of such record proved by evidence competent for that purpose under due proceedings, and the

right to contradict such proof by such evidence as may be at their disposition.

The averments as to the laws, constitution, and judicial offices of New Jersey, the plea of *nul tiel record*, the averments as to the lack of jurisdiction of the court of New Jersey, and the void character of the alleged judgment of the court of New Jersey, are all questions of fact. The laws of a State, the character of its courts, the effect in those States of the judgments of its courts, the validity or invalidity of such judgments, are all questions of fact, when raised outside of that State. *Hanley* v. *Donoghue,* 116 U. S. 1–7.

The return in this case not only denies the existence of the record alleged in the petition but denies that there ever was any proceeding in the Chancery of New Jersey; that there was ever any process issued out of the Chancery of New Jersey; that either the appellees or the children ever appeared in the Chancery of New Jersey, and in short denies every fact essential to give a court jurisdiction, and every fact essential to the existence of a judicial record. The appellees are prepared to prove the truth of these averments, and they cannot be prevented from proving their truth by the interposition of a demurrer without the correlative duty on the part of the demurrant of admitting their truth and dispensing with the proof.

The alleged writ of *habeas corpus* does not purport to be process out of the Court of Chancery. It is not entitled in the Court of Chancery, nor in any court, nor in any judicial district of the State, but is entitled simply "New Jersey, ss: " and purports to be issued under the authority of John T. Bird, vice chancellor, while it is indorsed "Allowed by the statute, John T. Bird, V. C." It is claimed by counsel for appellant that this writ was issued by the vice chancellor under the authority of the provisions of the Act of 1889 of the Legislature of New Jersey. If such be the valid law of New Jersey, the vice chancellor would have had the power to issue the writ and to hear and determine the same,

but no power or right to relinquish his jurisdiction, for the provision of the statute is mandatory that he "shall proceed in the same manner;" that is, in the same manner that the chancellor would proceed in *habeas corpus.* The alleged transcript indicates that he did attempt to proceed in a manner, and that after he had been proceeding from the 9th day of October until the 25th day of November, the chancellor, before whom there was not and never had been any proceeding pending, and out of whose court no process of any sort had ever been issued, and before whom neither the appellees nor the children had ever appeared, was, without notice to or knowledge of the appellees or the children, requested to make an order forthwith referring to the vice chancellor a proceeding which had never been begun or prosecuted before the chancellor, or in any way brought under his judicial authority. And the alleged transcript further shows that thereupon the said vice chancellor, who had theretofore been himself proceeding, as it is claimed under the statute, immediately upon having referred to him that which he had already assumed to have, from one who had it not, ceased himself to proceed altogether, and thereupon the chancellor who had it not and never had had it, but who had undertaken to refer it away from himself undertook to proceed and to make the pretended decrees which are relied on in this case as the decrees of a court of chancery.

2. The last proposition in the appellant's brief is that "a proceeding in *habeas corpus* is the proper remedy to obtain the custody of children withheld from one entitled to their custody, and that the doctrine of *res judicata* applies to proceeedings in *habeas corpus.*"

The last branch of this proposition is sufficiently answered by the illustrations heretofore presented as to the effect of giving conclusiveness to such decrees and judgments. But it is immaterial in this case what view may be taken of that proposition because the existence of any adjudication

is, as heretofore shown, completely denied, and the effect of
the demurrer is to affirm that denial.    It is furthermore
immaterial because the pretended decree does not disclose
that anything was adjudicated in the pretended proceed-
ings except the right of present and permanent custody.
The right of present custody has no reference to the future,
and the right of permanent custody cannot be awarded by
any court so as to conclude other courts, as the custody of
any infant must always be the subject of judicial investiga-
tion and determination throughout the minority of such
infant.    There is no ground whatever for the contention,
even upon the alleged transcript of the part of this pre-
tended record, that any matter set up by the return to the
writ in this case has been adjudicated.

All the authorities cited in support of the position that
*habeas corpus* is the proper remedy to obtain the custody of
children, are from the reports of decisions in the courts of
the several States.    It is immaterial for this court to con-
sider whether, under the judicial systems of the different
States, the Court of Chancery may proceed in the exercise of
its functions as *parens patriæ* originally or in aid of that
jurisdiction by writ of *habeas corpus*, or whether the courts of
law of the several States proceeding in *habeas corpus* may
exercise the equitable jurisdiction of the chancellor acting as
*parens patriæ.*    The proceeding in the court below is not a
proceeding in a State court, but it is a proceeding in a court
of the United States, and the writ of *habeas corpus* in this
case having been issued under the Revised Statutes of the
United States, by a judge of a court of the United States, not
sitting as chancellor, has no other right or duty than to de-
termine the mere question of illegal restraint or detention.
It is not denied that the Supreme Court of the District of
Columbia sitting in chancery has the right to consider and
determine the welfare of infants, nor that it has the right to
proceed in such a matter in aid of its jurisdiction in that
regard by the writ of *habeas corpus.*    But when the writ is

applied for, as in this case, under the Revised Statutes of the United States, the right of a court of the United States, or of a judge thereof, to proceed by *habeas corpus* as a legal writ under the Revised Statutes of the United States, is distinctly confined to the right to inquire into and release from illegal detention or restraint of liberty, and it and they are absolutely without jurisdiction by the said writ of *habeas corpus* to determine or to inquire into the question of the welfare of infants, the relative rights of parents or guardians, or any other matter pertaining to domestic relations.   Such is the distinct and unequivocal decision of the Supreme Court of the United States in the *Matter of Burrus*, 136 U. S. 586, in which the subject of proceedings in *habeas corpus* in the Federal courts, and by the several judges thereof, is reviewed in a very learned decision by Mr. Justice Miller.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. In our view of this case, it is wholly unnecessary to decide whether the statute of 12 Charles 2, Ch. 24, Sec. 8, is in force in the District of Columbia to the full extent claimed for it, viz., that the father of infant children may by deed or will transfer their exclusive custody and control to a guardian, regardless of the fact that their mother, his wife, may be competent, willing and in all respects qualified to maintain, educate and train them properly.

2. The decision of the case as presented on this record turns upon the effect that must be given to the decree of the Chancery Court of New Jersey.

It will be remembered that the litigation began in a petition for a writ of *habeas corpus* filed by the appellant. The children were then in New Jersey and were produced in court.   The appellees, both citizens of New Jersey and domiciled therein, were served with process and appeared in person and by counsel.

Treating the action as a proceeding not to set the children at liberty, but to determine the right to their custody

and control, which it really was, the appellees answered
fully, setting out their title under the will of the father, and
specially charging the unfitness of the mother to have the
control of the children.    Evidence was taken in accordance
with the ordinary practice in chancery cases, and upon pe-
tition, answer and proof, the decree was rendered denying
the right of the appellees and awarding the permanent cus-
tody and control of the children to the appellant.

(1) The first question is, can the doctrine of *res judicata*
be founded on the decree rendered in such a proceeding?

The great object of the writ of *habeas corpus* was to obtain
the release of all persons illegally restrained of liberty, and
its chief application has been in cases of detention for al-
leged crimes.    The judgments in such proceedings, if
against the person illegally held, were generally not re-
garded as precluding inquiry into the facts by other courts
of competent jurisdiction.    However, in such cases the cus-
tom has grown, and in many instances has been sanctioned
by statutes to discharge the writ upon a return showing
that there has been an adjudication by a competent court,
unless there shall have been in the meantime a substantial
change in material conditions.

In the case of infants the processes of the writ necessarily
become widened and extended.

These were, upon occasion, not only to be released from
illegal or improper custody, but also by reason of their
helpless condition, to be provided with continued, if not
permanent, custody and control.    In such cases the contests
generally concern the conflicting rights of claimants to the
custody and control of the infant rather than the mere ques-
tion of its right to be discharged from an illegal restraint.
As concerns these contestants and the matters at issue be-
tween them, we see no reason why the principle of *res judi-
cata* should not apply to the judgment or decree of a court
of record having jurisdiction of the subject-matter and of
the parties.

For this view we have the support of abundant authority :
Freeman, Judg., Sec. 224; Church, Habeas Corpus, Sec. 387;
Tyler, Infancy and Coverture, 291; 1 Van Fleet, Former
Adjudication, 93; 9 Am. & Eng. Ency. Law, 238; *Mercein*
v. *People,* 25 Wend. 64; *Perry* v. *McLendon,* 62 Ga. 598, 603;
*Dubois* v. *Johnson,* 96 Ind. 6, 14; *Brooke* v. *Logan,* 112 Ind.
183, 186; *State* v. *Bechdel,* 37 Minn. 360; *McConologue's
Case,* 107 Mass. 154, 171; *State* v. *Baird,* 19 N. J. Eq. 481,
486.

In *Brooke* v. *Logan, supra,* the Supreme Court of Indiana
said : " The question of the custody of a minor child, once
properly and finally adjudicated, whether in a *habeas cor-
pus* proceeding or otherwise, is settled for all time, unless
there be an appeal, and the judgment rendered is impreg-
nable as against a collateral assault. . . . A subsequent
writ may be awarded, but upon the subsequent hearing evi-
dence will not be heard which goes back of the previous
adjudication."

The Supreme Court of Minnesota enounces the same doc-
trine in an emphatic manner. *State* v. *Bechdel, supra.* Hav-
ing noted the distinction between cases purely criminal and
those where civil rights of the parties are involved, it was
said : " The case is really one of private parties contesting
private rights under the form of proceedings on *habeas cor-
pus.* In our judgment, in such cases both principle and
considerations of public policy require the application of the
doctrine of estoppel to judicial proceedings. We therefore
hold that a former adjudication on the question of the right
to the custody of an infant child, brought up on *habeas cor-
pus,* may be pleaded as *res judicata,* and is conclusive upon
the same parties upon the same state of facts.

In *McConologue's Case, supra,* the prisoner, having been
once discharged from restraint by an officer of the United
States Army as an enlisted soldier, was retaken and com-
pelled to apply for a second writ. He was again discharged,
and Mr. Justice Gray, speaking for the court, said : " Any

facts which the respondent deemed material upon that issue should have been proved at the hearing, and any ruling in matter of law with which he was dissatisfied should have been reserved. The judicial discharge of a prisoner upon *habeas corpus* conclusively settles that he was not liable to be held in custody upon the then existing state of facts."

The doctrine of *res judicata* applies with stronger reason to the decree in question here, because the court rendering it had, in adddition to concurrent jurisdiction with the courts of law in *habeas corpus*, general jurisdiction over infants. If the question is determinable by the law as interpreted in New Jersey ; that is to say, if the decree is to be given such effect as it would have in that State, there can be no question of its conclusiveness. *State* v. *Baird*, 19 N. J. Eq. 481, 486. It was said by the Supreme Court of New Jersey in *Richards* v. *Collins*, 45 N. J. Eq. 283, that: " The chancellor in this State exercises a concurrent jurisdiction with law judges on *habeas corpus*. No doubt it is true that in the ordinary use of the writ the court may content itself, where the subject of the alleged imprisonment is capable of self-protection, with a judgment or order freeing the person from illegal custody and restoring him to liberty. But it is quite clear that in this use of the writ judges have not refused to exert a larger power, and have quite frequently, in the case of children, taken the subject of illegal restraint from the custody of one and handed it over to another. . . . The court may stop with the mere removal of restraint, or, in its discretion, may go farther and determine for the time being the custody of the subject of the writ. But the court of chancery exercises far more extended control in respect to the custody of children in virtue of an inherent jurisdiction over that subject. In the exercise of this higher authority that court may permanently fix the status of infants, even in disregard of the legal rights of parents, where the welfare of the infant requires it ; nor is it material to the exercise of this power in what way the subject is

brought into court. . . . In my opinion, the pleadings present a controversy such as addresses itself to the general equitable powers of the court. The parties are claiming the right of permanent custody of the child, and they stand in a position to litigate that question. Facts sufficient for its decision are put upon the record. The case throughout has proceeded as one in the equity court."

What is there said is strictly applicable to the record in this case.

(2) That the decree must be given the same effect in other jurisdictions that it would have in New Jersey is well settled. " Without doubt," said Chief Justice Waite, " the constitutional requirement (Art. IV, Sec. 1) that ' full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State,' implies that the public acts of every State shall be given the same effect by the courts of another State that they have by law and usage at home. This is clearly the logical result of the principles announced as early as 1813 in *Mills* v. *Duryee* and steadily adhered to ever since." *Chicago, etc., R. Co.* v. *Wiggins Ferry Co.,* 119 U. S. 615, 622; *Christmas* v. *Russel,* 5 Wall. 290, 302; R. S., Sec. 905. And the doctrine applies as well to decrees affecting status, as, for instance, decrees for divorce, alimony, &c. *Barber* v. *Barber,* 21 How. 582, 596; *Cheever* v. *Wilson,* 9 Wall. 108, 123; *Cheely* v. *Clayton,* 110 U. S. 701, 705; *Laing* v. *Rigney,* 160 U. S. 531; see also *Carpenter* v. *Strange,* 141 U. S. 87, 105; *Rich. & Danv. R. Co.* v. *Gorman,* 7 App. D. C. 91.

3. The conclusiveness of the decree necessarily depends upon the conditions that the court had jurisdiction of the subject-matter and the parties, and into that we proceed to inquire.

(1) As to the jurisdiction over the appellees there can be no question. They were citizens of New Jersey, found and served with process in that State.

(2) The infants over whose custody the contest raged, were

then in the State of New Jersey and subject to the jurisdiction of the Court of Chancery in that State. Conceding that their legal domicile was at the time in the District of Columbia, a question that is not altogether free from doubt, they were nevertheless subject to the jurisdiction of the Court of Chancery whilst there. *Johnston* v. *Beattie,* 10 Cl. & Fin. 42; *In the Matter of Hubbard,* 82 N. Y. 90; *Woodworth* v. *Spring,* 4 Allen, 321. That the power has been or may be abused, is no argument against its existence. On the other hand, where this jurisdiction is well established, courts have often, through comity, taken infants from the custody of domestic guardians and delivered them to the guardian appointed in their legal domicile, for return thereto. *Nugent* v. *Vetzera,* L. R. 2 Eq. 704, 712; *Woodworth* v. *Spring, supra.*

The denial of this jurisdiction of the chancellor, whether exercised on *habeas corpus* or otherwise, does not come in very good grace from the appellees, who, by detaining the children in New Jersey, necessarily forced the appellant to seek her rights in the courts of that State. The appellees must reasonably have apprehended that the appellant would seek to recover her children upon the death of their father, and yet, instead of returning them to the District of Columbia, which was also the domicile of that mother, and to the jurisdiction of its court, they compelled her to resort to the courts of their own domicile in the first instance.

The mother began her proceeding with great promptness; but it was not an unreasonable thing to do after she had been denied access to her children ; nor was it unreasonable for her to presume that appellees, who had always lived in New Jersey, would remain there with the children.

3. The plea that the children, at the time of the decree rendered, were not in New Jersey, but in the District of Columbia, and therefore the court had lost its jurisdiction, is utterly untenable.

That a litigant, by violating the confidence of the court,

and in direct contempt of its authority, can wholly defeat its jurisdiction by absconding with the thing or person that is the subject of contention is an inconceivable proposition. It is true the power of the court to give immediate execution of its decree may be thus rendered nugatory, but the power to decide the questions at issue and to determine the title of the respective parties remains and cannot be taken away. That the court may have rendered an erroneous decision is of no importance whatever. If the appellees by their conduct rendered it impossible for their counsel to appear and represent them at the hearing and thereby failed to have the merits of their cause fully and effectively presented, the fault is their own and they must bear the consequences of their deliberate action. Possibly, had they remained in court, the decision might have been different; or they might have reversed this decree on appeal to the highest court. But, erroneous or not, the decree must be considered equally conclusive of all matters that were or might have been offered on behalf of the defendants therein. *Nesbitt* v. *Riverside Independent District,* 144 U. S. 610, 618 ; *Dowell* v. *Applegate,* 152 U. S. 327, 343 ; *Scotland Co.* v. *Hill,* 112 U. S. 183; S. C. 132 U. S. 107, 113 ; *Laing* v. *Rigney,* 160 U. S. 531, 542.

If the contention as regards the loss of jurisdiction, by reason of the removal of the children from New Jersey, was sustained by this court, what assurance have we that our judgment in this case may not be rendered equally vain with that of the Chancery Court of New Jersey?

The children might be spirited away into Maryland or Virginia and the same contention made in the courts of those States as to the effect of the judgment in this jurisdiction. We apprehend that those courts would give effect to the decree herein so far as the rights of the contestants are concerned. We will, at least, furnish them no precedent for different action.

4. The next objection to the jurisdiction is that there is no such judicial officer as the vice chancellor. The constitution of New Jersey makes no provision for such an officer, and it is contended that the statute creating him and regulating proceedings before him is in violation of the constitution. Passing by the argument in respect of the credit to be given to the decrees of *de facto* tribunals, we are of the opinion that there is nothing in the contention, and that, too, without regard to what may or not be the correct construction of the constitutional provision. The statute has been in force twenty-five years and its constitutionality has been continuously upheld by an universal acquiescence.

Each time that the chancellor gave effect, as he did in this instance, to a decree advised by the vice-chancellor, he necessarily decided that he was a lawfully created officer. This of itself is sufficient. The Supreme Court of the United States itself in such cases will follow the decisions of the higher courts of the State, on the construction of the constitution and laws of the State, unless, of course, they conflict with some provision of the Federal Constitution. *Crowley* v. *Christensen*, 137 U. S. 86 ; *Giozza* v. *Tiernan*, 148 U. S. 657, 661 ; *Pittsburgh, etc., R. Co.* v *Backus*, 154 U. S. 421, 425.

Any other rule in respect of the question here considered would be in violation of interstate comity at least, and would render nugatory the constitutional provisions concerning the effect to be given in one State to the public acts and judicial proceedings of another.

The precise question, we think, however, is covered by the decision of the Supreme Court in a recent case. *Laing* v. *Rigney*, 160 U. S. 531, 542. In that case a wife had sued her husband for divorce in the Chancery Court of New Jersey, where both parties lived. Personal service was obtained and the defendant filed an answer, denying the allegations of the bill, on August 4, 1883. He subsequently removed to New York. In May, 1886, plaintiff filed a supplemental

bill, alleging new facts, upon which she prayed a decree. Service of a copy of this bill was had upon the defendant in New York, who took no notice of it.    Final decree was rendered, upon proof sustaining the allegations of the supplemental bill, for divorce and alimony.

Suit was then instituted upon that decree in a State court of New York, and the Court of Appeals held, when the case came before it, that the suit was properly dismissed, because the defendant had not been served with process in such manner as to give the court jurisdiction over him in respect of the matters alleged in the supplemental bill under the law and usage of New Jersey.

On error to the Supreme Court of the United States this judgment was reversed.   Mr. Justice Shiras, speaking for the court, said : " In the absence of any statutory direction on the subject and of any reported decision of the Supreme Court of that State, we are justified in finding the law to be as declared in the very case in hand, where the chancellor of the Chancery Court of New Jersey has entered a final decree based upon an original bill, the process under which was served upon the defendant within the State, and upon a supplemental bill, a copy of which with a rule to plead, was served upon the defendant without the State.   So long as this decree stands it must be deemed to express the law of the State.   If the defendant deemed himself aggrieved thereby his remedy was by an appeal."

Referring then to the testimony of an attorney of New Jersey concerning the law of that State in such cases, upon which the New York court founded its decision, the learned justice said further ; "The opinion of the chancellor differed from that of the witness, and, what is more important, his *judgment* was that, under the laws and practice of the State of New Jersey, the defendant was in his court, subject to its jurisdiction and bound by its decree."

5. Assuming that the vice chancellor was a *de jure* officer fully authorized to hear causes in equity upon reference of

the chancellor, as provided by the statutes and rules of court, it is contended that his power to grant the writ of *habeas corpus* is a special power conferred on him by statute, and therefore the whole proceeding, from petition to decree, should have been before and by him, without the intervention of the chancellor or the Court of Chancery.

The statute referred to, enacted in 1889, reads thus : " That the vice chancellors, or either of them, shall have the same jurisdiction, power and authority to grant all writs of *habeas corpus*, and to hear and determine the same, that the chancellor of this State now has, and he or they shall proceed in the same manner."

The petition for the writ of *habeas corpus* was addressed to Hon. John T. Bird, vice chancellor of the State of New Jersey, but was filed in the Court of Chancery, and the writ issued from said court under the hand of the clerk and the seal of said court. All the proceedings are of record in that court and the transcript of the record is certified by the clerk and the chancellor. Whilst the vice chancellor may issue the writ, it appears that the custom and usage is to conduct the proceeding in the Chancery Court under the rules thereof and the supervision of the chancellor as in ordinary equity causes. So, in accordance with that practice, the decree when rendered was signed by the chancellor as advised by the vice chancellor after the hearing before him. The transcript of the record shows that on November 25, 1895, the day before the final hearing, the chancellor by formal order referred the cause to John T. Bird, vice chancellor, " to hear the same for the chancellor and to report to him and advise what order or decree should be made therein."

Whilst there are a chancellor and several vice chancellors in New Jersey, there is but one Court of Chancery, and it has been held in that State that an act of the legislature conferring certain power upon the chancellor, meant not him as an individual of that designation, but the Court of

Chancery over which he presided. *Del. Bay & C. M. R. Co.* v. *Markley*, 45 N. J. Eq. 139, 147.

Whether the statute meant that applications might be made to the vice chancellor for the writ, and that the same might be granted by him without direction of the chancellor, is immaterial, for it seems quite clear that it was intended to be issued out of the Court of Chancery, and, when returned, to be heard therein according to the usual practice of that court. In this case the infants were brought into the Court of Chancery, likewise the parties, and the hearing was had therein.

The decree is the decree of that court and not the order merely of the chancellor or the vice chancellor, and, as we have before said, it must have the same effect here that it has " by law and usage at home."

Let it be conceded that the writ was irregularly issued; that the order of reference was not made at the proper time, or that it ought not to have been made at all; and that the decree was irregularly made and signed; still these were but irregularities or errors that cannot affect the validity of the decree as a decree of the Court of Chancery upon a collateral inquiry. *Del. Bay & C. M. R. Co.* v. *Markley*, 45 N. J. Eq. 139, 148; *White* v. *Crow*, 110 U. S. 183, 189.

4. What has been said as regards the conclusive effect of the decree of the Court of Chancery of the State of New Jersey has application only to the parties plaintiff and defendant therein and to the issues between them.

As between Mrs. Slack on the one hand and Mr. and Mrs. Perrine on the other, her right as mother to the custody of the infants was adjudged superior to theirs under the will of William H. Slack, or under any other claim they might have asserted. That will did not require probate to give it efficacy; nor could it acquire efficacy from probate, as regards the right of guardianship claimed thereunder, any more than it could in respect of real estate in this jurisdiction. As the foundation of a right to the custody of the

children as against the claim of the mother, it has been destroyed by the decree. Until reversed or set aside, that decree, even if erroneous, must remain a bar to the assertion of any claim under said will by the appellees as against Mrs. Slack.

In so far as the infants themselves are concerned, the right of the mother to their permanent custody and control has not been settled by that decree. Their rights cannot be concluded or prejudiced by it. Their welfare is a matter of paramount consideration at all times and under all circumstances. Courts of competent jurisdiction will always extend their arms to protect infants from injury and contamination, to the extent, when necessary, of taking them from the custody of guardian or parent. *Eyre* v. *Shaftesbury*, 2 Lead. Cas. Eq. 1416, 1517, *et seq.*; *Richards* v. *Collins*, 45 N. J. Eq. 283.

As the children are now in the District of Columbia, whether rightfully or wrongfully, they are within the jurisdiction of its courts for the purpose of necessary care and protection. The fitness or unfitness of appellant to have the permanent care and control of the children is not a matter before this court, nor as to them and their rights has it been conclusively adjudicated. If, when these children shall have been delivered to her in accordance with the opinion of this court, it may be made to appear to the satisfaction of a court having jurisdiction in the premises, that she is not a proper person to be entrusted with the care and education of her own children, other provision may be made therefor.

5. In conclusion, it may be remarked that we have not failed to consider the point made, that, by reason of her demurrer to the answer and return of appellees, in which they deny the jurisdiction of the court of New Jersey in the premises, the appellant has admitted the truth of that allegation. The denial was not the equivalent of a plea of *nul tiel* record. Had it been, it would have put in issue the

existence of the record merely. *Harper* v. *Cunningham*, 5 App. D. C. 203. And that record was an exhibit to the petition, duly certified in compliance with the act of Congress (R. S., Sec. 905), and proved itself. The real effect of the answer was to deny the jurisdiction of the vice chancellor. That is a conclusion of law from the facts shown in the record and has been disposed of.

6. It follows necessarily from what has been said, that *the judgment appealed from must be reversed, with costs to the appellant, and the cause remanded to the court from whence it came, with directions to sustain the demurrer to the respondents' answer and return, and to proceed with the cause in conformity with this opinion. And it is so ordered.*

ALVEY, Ch. J.: I must dissent *in toto* from the opinion of the majority of the court in this case. I think the order dismissing the application for the writ of *habeas corpus* should be affirmed. I will file the reasons for this dissent hereafter.

On June 25, 1896, Mr. Chief Justice ALVEY filed the following dissenting opinion:

This case is one of great delicacy, as it is of great importance, in a much more extended view than the effect upon the rights of the immediate parties concerned. It involves questions of the gravest character of both State and domestic relations and government; and it is in view of the very serious consequences that will likely result from the opinion of the majority of this court, that I feel compelled to dissent from the conclusions arrived at by them. I shall state the grounds of my dissent in as brief a manner as the nature of the case and the complication of the proceedings will admit of, having reference to reasonable clearness of presentation.

The case is a most unfortunate one, and especially so to the

two little children, the subjects of the controversy, now about eleven and nine years of age; and the scandals and the criminations and recriminations, respecting the lives and conduct of the parents, with which the record before me abounds, can have no other effect than to cast a shadow or blight upon the lives of these innocent children. In all proceedings of this nature, however, without respect to parental rights, it is the first and most imperative duty of the court to consider the welfare of the children, and to afford them full protection, so far as that can be done, even though it may involve the necessity of taking them from the custody and control of father or mother, or those into whose care they may have been placed by the selection of either parent.

The record shows that William H. Slack, the late husband of the appellant Mary Kemble Slack, and the father of the two infant children, Mary J. G. Slack and Catharine A. Slack, the subjects of this bitter contest, on the 12th of July, 1895, made and executed his last will and testament, whereby he devised and bequeathed to his sister, Mrs. Addie Slack Perrine, his entire estate in trust for his two infant children, and thereby appointed his sister, Mrs. Perrine, the sole executrix of his will, and the sole guardian of the persons and estate of his two minor children, until they should arrive at the age of twenty-one years. This last will and testament was made here in the city of Washington, where the testator, his wife, and his children, all resided, and had their lawful domicile; though the husband and wife, owing to domestic dissensions, were living separate and apart from each other. William H. Slack, the husband and father, died on the 2d of October, 1895, at a watering place in New Jersey, where he had been spending some months for the benefit of his health, though still retaining his domicile in the city of Washington. It appears that during his sojourn in New Jersey, the father requested that his two children should be sent to him, and they were accordingly sent, and they were in the care of Mrs. Perrine at the time

of the death of their father, and they remained in her care thereafter up to the present time.

It also appears, that a few days after the death of William H. Slack, his will was produced and offered for probate by the sister, Mrs. Perrine, in the Supreme Court of the District of Columbia, and to which will there was a caveat entered by the widow, Mrs. Mary Kemble Slack; and after issues framed and trial had, the will was adjudged to be good and valid, and was thereupon duly admitted to probate, and letters testamentary were granted to the executrix named in the will.

It also appears, that in October, 1895, a petition was filed in New Jersey, addressed to Vice Chancellor Bird of that State, to which Mrs. Slack afterwards became a party, praying that a writ of *habeas corpus* should issue, to bring before the vice chancellor the two infant children, then in the State of New Jersey, alleged to be unduly and illegally restrained, and detained from their mother, by Mr. Perrine and Mrs. Perrine, his wife; and in that petition it was averred that William H. Slack had abandoned his wife in March, 1894, at Washington City. That in October of that year, in accordance with his request, Mrs. Slack had sent the two children to Trenton to visit their aunt and father at Mr. Perrine's house. That since that time they had been detained from their mother, who had made diligent efforts to regain possession of them, and to that end had instituted a suit in September, 1895, for their custody and for their maintenance, in Washington City. That, although demand had been made for the children, Perrine and wife had refused to deliver them to the mother, and denied the latter access to her children, pretending that their father had constituted Mrs. Perrine guardian to said children. The petition prayed that the vice chancellor, upon return of the writ, would direct the children to be released from their illegal restraint and detention, and that they be delivered to their mother. By an indorsement upon the petition, it

was ordered that the writ be "allowed by the statute," and which direction was signed by the vice chancellor. To the writ, thus ordered to be issued, Perrine and his wife made separate returns. By their separate returns they alleged that the domicile of the children was the city of Washington; and that they had no property in New Jersey; and that, by the laws in force in the District of Columbia, a father had and still has the right to appoint a testamentary guardian of his children, which right, the father, William H. Slack, had exercised by his will, which had been filed for probate, and that the matter of the probate of the will was then pending in the Supreme Court for the District of Columbia, and which court had exclusive jurisdiction in the premises. That Mrs. Perrine was entitled, by virtue of the will and appointment thereunder, to the sole care and custody of said children who desired to remain with her. The returns then set out various matters going to show the moral unfitness of the mother to have the care and control of her infant children.

The petitioners, Buckley and Mrs. Slack, traversed the allegations of the returns to the writ. They insisted that the domicile of the children was in New Jersey, though they expressly admitted under oath, that William H. Slack and his wife, at the time of the death of the former, were both domiciled in the city of Washington; but they denied that the question of the legal right to the custody of the children depended upon the laws of the United States in force in the District of Columbia; and denied that the father had, by last will and testament, appointed a guardian for his children.

Before any final order was passed in the case, the children were brought to this District, the place of their domicile, where they have remained ever since, in the care and custody of their guardian, Mrs. Perrine. Their mother has since taken up her residence in the State of New York. And after the children were withdrawn from New Jersey

and brought to this District by their guardian, (whether justifiably or not I shall not stop to inquire, as I do not deem it material in my view of the case) the vice chancellor of New Jersey, with the approval of the chancellor, in the *habeas corpus* proceedings pending in that State, placed the respondents in contempt for failure to produce the children in court, in accordance with a previous interlocutory order, and then proceeded to declare " that the said minor children were illegally restrained from the custody of their mother, by the respondents, and that the petitioner, Mary Kemble Slack, was a fit and proper person to have the custody of her said minor children, the subjects of the *habeas corpus* proceeding therein, and that the interest of the said minor children require that they be committed to the care, custody and control of their said mother, during their minority; *and that she was by the law of the land entitled to such custody against said respondents or either of them;*" and then proceeded to adjudge and determine that said infant children " be, and they are hereby, relieved and discharged from the illegal detention and restraint in which they are held by the respondents, and hereby are committed to the care, custody and control of the petitioner, Mary Kemble Slack, for the reasons and causes aforesaid;" and it was further " ordered, adjudged, &c., that the care, custody and control of said infant children be committed and given to the petitioner, Mary Kemble Slack, their mother, *for and during the minority of each of them,* respectively, as against the respondents, or either of them, for the reasons aforesaid." This decree was advised by the vice chancellor and signed by the chancellor.

A few days after this decree in New Jersey, a petition was filed in the Supreme Court of the District of Columbia, *as a court of law,* by Mrs. Slack, the mother, against the present appellees, for a writ of *habeas corpus* to compel the production and delivery to her of the two minor children; and in her petition she repeats substantially the same allegations

made in the petition for *habeas corpus* in New Jersey. She states and sets forth the decree of the Chancery Court of New Jersey, of the 26th of November, 1895, as having adjudged and determined her right to the custody and control of the children, and that, therefore, they should be delivered to her; she alleges that the children are illegally and unjustly detained from her in this District. She alleges that the decree of the New Jersey Chancery Court *is final and conclusive upon the parties to those proceedings,* and she exhibits with her petition a copy of the New Jersey proceedings and decree. The present application, therefore, is in the nature of an action upon and to enforce the order or decree of the chancellor or vice chancellor of New Jersey, made under a statute of that State, conferring special jurisdiction upon the vice chancellor in matters of *habeas corpus.* Upon the petition filed in the court in this District, the writ of *habeas corpus* was at once issued, and the defendants therein, the present appellees, made return thereto; and among other things set forth in the return, they set up and insisted upon the right of Mrs. Perrine as testamentary guardian of the children, under the will of their father, and utterly denied that the order or decree of the chancellor or vice chancellor of New Jersey, set up and relied upon by the petition of Mrs. Slack, has any force or effect in this District or jurisdiction whatever.

Instead of answering or traversing the return, if facts were denied, or if the return was deemed insufficient, of moving for a better return to the writ, and in default of such sufficient return, for an attachment against the respondents, the petitioner demurred to the return;—a method of testing the sufficiency of the return not recognized as proper by the common law. *The King* v. *Winton,* 5 T. R. 89 ; *Matter of Stacey,* 10 John. 328 ; *Cunningham* v. *Thomas,* 25 Ind. 171. The proper mode of procedure on the return to the writ is prescribed by Section 760, Rev. Stats. U. S. All denials or allegations by the petitioner, in reply to the return, should

be made under oath, as required by the statute.  But treating the demurrer *as* having the effect only of setting down the case for hearing on the petition and return to the writ, in such case the petitioner must be considered *as conceding the truth of all material facts stated in the sworn return*; for otherwise their truth could not be established, and it is not allowable to the petitioner, by demurring, to preclude the respondents from the right of establishing the facts alleged by them.  *Richards* v. *Collins,* 45 N. J. Eq. 283.

But, in the view I have of this case, not intending to discuss the evidence relating to the fitness of the petitioner to have charge of her children, it is not very material whether we treat the case as set down on demurrer proper, or on petition and sworn return to the writ.  In either mode of considering the case, the result is substantially the same.

The court below overruled the demurrer, and discharged the writ; and it is from that order that this appeal is taken

The record contains a large mass of matter, but upon the pleadings in the *habeas corpus* proceedings, but two principal questions are presented.

1st.  Whether the statute of 12 Car. 2, Ch. 24, Sec. 8, is in force in this District, as part of the statute law, adopted by act of Congress ?

2d.  Whether the order or decree in the *habeas corpus* proceeding in New Jersey, adjudging and decreeing the care and control of the children to the mother, until they attained the age of twenty-one years, is such a judicial record and proceeding of that State as to be entitled to full faith and credit, and therefore to be enforced in this District, under the Constitution and act of Congress of the United States ?

1.  In regard to the first of these questions, we must ascertain whether the statute of 12 Car. 2, Ch. 24, Sec. 8, was adopted and in force in Maryland prior to the act of Congress of 1801, adopting the laws and statutes then in force in that State, for this District.  That question is not of doubtful solution.

By Article 3 of the Declaration of Rights of Maryland, of 1776, it was declared "That the inhabitants of Maryland are entitled to the common law of England, and the trial by jury according to the course of that law, and to the benefit of such of the English statutes as existed at the time of their first emigration, and which by experience have been found applicable to their local and other circumstances, and of such others as have been since made in England or Great Britain, and have been introduced, used and practiced by the courts of law or equity." Among the English statutes thus introduced and adopted was the statute of 12 Car. 2, Ch. 24, Sec. 8. Of this there never has been a serious question in the courts of Maryland; and the 8th section of the statute is expressly recognized as in full force and operation by Subch. 12, Sec. 1, of the Testamentary Act of that State of 1798, Ch. 101, adopted and in force in this District. Section 8 of 12 Car. 2, Ch. 24, has been by a recent case held by the Court of Appeals of that State to be in full force and operation there, under the Declaration of Rights. *Hill* v. *Hill*, 49 Md. 450 ; *Dorsey* v. *Sheppard*, 12 G. & J. 192, 199. Sections 8 and 9 are the only parts of the statute in force in Maryland, according to the Report of Kilty, p. 238 ; Alex. Brit. Stats. 466 ; and of course, no other parts of the statute are in force here. The British statutes thus adopted have the same force and effect as if enacted by the legislature of the State, and they form a part of the statute law of the State, to the same extent as if enacted *in totidem verbis.*

By the Act of Congress of February 27, 1801 (2 Stat. 103, 104, Ch. 15, Sec. 1), it was enacted that the laws of the State of Maryland, then in force, not inconsistent with the laws of the United States applicable to the District of Columbia, except as they might thereafter be modified or repealed, should continue in force in said District; and this adoption included the common law and the British statutes then in force in the State of Maryland. And as showing how the British statutes thus adopted and continued in force, have

been treated and considered by the Supreme Court of the
United States, I will merely refer to the cases of *United States*
v. *Simms*, 1 Cr. 258, and *Cathcart* v. *Robinson*, 5 Pet. 264—
both cases going into that court from the District of Colum-
bia. In the last of the cases just mentioned Mr. Chief Jus-
tice Marshall, in considering the question of the applicabil-
ity of the statute of 27 Elizabeth in regard to fraudulent
conveyances, said : " The statute of Elizabeth is in force in
this District. The rule, which has been uniformly observed
by this court in construing statutes, is to adopt the construc-
tion made by the courts of the country by whose legislature
the statute was enacted. This rule may be susceptible of
some modification, when applied to British statutes which
are adopted in any of these States. *By adopting them they
become our own as entirely as if they had been enacted by the
legislature of the State.* The received construction in England
at the time they are admitted to operate in this country, in-
deed to the time of our separation from the British empire,
may very properly be considered as accompanying the stat-
utes themselves, and forming an integral part of them."
There is, therefore, no modified or qualified sense or mean-
ing to be attached to a statute thus introduced, but such
statutes are our own, and made so by an act of Congress,
and are therefore to be considered as if enacted by Congress,
and are to be so construed.

That Section 8 of the statute of 12 Car. 2, Ch. 24, is in
force in this District is as certain as that it is in force in the
State of Maryland ; and that, too, by virtue and operation
of a comparatively recent act of Congress. The statute of
12 Car. 2, Ch. 24, Sec. 8, is not only referred to as an exist-
ing law by the Maryland Testamentary Act of 1798, Ch. 101,
in force here, but, by the act of Congress of February 20,
1846, Ch. 8 (now Secs. 937 and 938 Rev. Stats. D. C.), there
is express recognition of this statute of 12 Car. 2, as in force
in this District ; for by that act of Congress of 1846, it is
provided that the Orphans' Court, now the Supreme Court

of the District, shall have power to appoint a guardian to any infant orphan being entitled to property in this District, or who may reside herein, *except when such orphan may have a testamentary guardian* ; and the court may require guardians, either testamentary or otherwise appointed, to give bond. There is no other statute than that of 12 Car. 2, Ch. 24, in force here, authorizing the appointment of testamentary guardians, and no other statute defining the rights and duties of such guardians, to which the act of Congress could have referred.

By the eighth section of statute 12 Car. 2, Ch. 24, it is declared, " that such disposition of the custody of such child or children shall be good and effectual against all and every person or persons claiming the custody or tuition of such child or children as guardians in socage or otherwise ; and that such person or persons to whom the custody of such child or children hath been or shall be so disposed or devised as aforesaid, shall and may maintain an action of ravishment of ward or trespass against any person or persons which shall wrongfully take away or detain such child, &c., for the recovery of such child, and shall and may recover damages," &c. The statute places the guardian appointed *in loco parentis* to the child, and enables such guardian to apply to the courts to obtain control of the ward. This right of appointment of guardian is in recognition of the common law right of the father, as head of the family, and as being responsible for the support and education of his children.

There has been, both in and out of court, a good deal of sentimental declamation indulged in in regard to this statute of 12 Car. 2, and it has been reprobated as being in violation of the natural rights of the mother, and in conflict with the present civilization of the people. .But while it is sufficient to say that courts of justice, and especially courts of common law, are not at liberty to disregard the statute, and act upon any mere feeling of repugnance to it, we must

bear in mind that this statute of Charles has been in force
in England for more than two centuries, and that it is still
in force there, and has stood the test of English civilization,
with the slight modification, if modification it can be called,
produced by what is known as Justice Talfourd's Act, passed
in 1839, whereby it is provided that the chancellor or master
of the rolls may, upon the petition of the mother, where the
infant is within the age of seven years, order that such infant
shall be delivered to and remain in the custody of the mother
until attaining such age of seven years, subject to such regula-
tions as the chancellor or master of the rolls shall deem con-
venient and just; provided the mother *be a fit and proper
person to have the custody of the infant.* The act of Charles,
says Chancellor Kent, "has been pretty extensively adopted
in this country." 2 Kent Com. 224. The act has been adopted
in several of the States of the Union; and in many others it
has been the foundation of express legislation, adopting in
substance its main provisions. This is fully shown in the
very full and learned opinion of Mr. Justice Hagner, delivered
in the equity cause forming a part of the present record. The
reason and policy of such legislation are well understood.
The father, the head of the family, and responsible for the
tuition and support of his children, is allowed to delegate his
authority to his surviving wife, or to his selected relation or
friend, to be exercised after his death. And there may be
many reasons why the wife should not be selected. The pros-
pect of a second marriage of the wife, and the introduction
of his children into the household of, and to be made sub-
ject to the control and, possibly, to harsh and unsympathizing
treatment of a stranger to his blood; then the age or ill health
of the wife; or worse still, her mental or moral unfitness to
train and take proper care of the children, are all matters
that would likely influence, and may well justify a father,
solicitous for the welfare of his children, in making the selec-
tion of a relative or friend to be their guardian, rather
than the mother. Indeed, in many cases, the act has a

most beneficial operation; and this very case, if the allegations and depositions be true (a question that I do not intend in any manner to decide), would furnish an instance of such beneficial operation of the act. Like all powers of appointment, this power in the father to appoint by testament a guardian to his children is liable sometimes to be exercised in what would appear to be an arbitrary manner, and in disregard of the feelings of the mother. But the history of the statute does not show this to have been frequently the case in reality. The principle of the statute, taking it all in all, appears to have been beneficial in the family relations, and as furnishing the means of securing the welfare of children. If not so, it could hardly have been retained in force as part of the English and American statute law to the present day.

The statute still being in force, let us see what has been decided to be the construction and effect of that statute. In the *Matter of Mary Ellen Andrews,* L. R. 8 Q. B. 153, in 1873, the subject of the statute of 12 Car. 2, Ch. 24, Sec. 8, was fully discussed before the Court of Queen's Bench, composed of Cockburn, C. J., Mellor, Lush, and Archibald, Justices; and after time to consider of the opinion, it was held, that a person, who has been duly appointed under 12 Car. 2, Ch. 24, Sec. 8, by the will of a father to be guardian of his child, stands *in loco parentis,* and having, therefore, *a legal right to the custody of the infant,* may, in order to obtain possession of such ward, claim a writ of *habeas corpus,* which a common law court *has no discretion to refuse,* if the applicant be a fit person and the child too young to choose for itself. And if a court of common law, as is the court to which the present application was made, has no discretion to refuse the writ at the instance of the testamentary guardian to obtain the possession of the infant, it would seem, *a fortiori,* that such guardian can successfully defend his or her possession of such infant against the claim of any other person; and especially so, in the absence of any charge or

proof that the guardian was an improper person to have charge or control of the infant. In this case, there is no ground whatever, either alleged or shown in proof, for imputing to the testamentary guardian, any unfitness whatever to have charge of the children.

But while such is the right of the testamentary guardian as defined and enforced by the courts of the common law, a court of chancery, in dealing with questions of this nature, in the exercise of the sovereign right of *parens patriæ*, assumes a more extensive authority than that exercised by the common law courts ; and in the view of a court of chancery, a guardian appointed by will under the statute of 12 Car. 2, Ch. 24, Sec. 8, has no more power than guardians in socage, and is but a trustee on whose misbehavior, or giving occasion of suspicion, the court of chancery will interpose for restraint of abuse. *Beaufort* v. *Berty*, 1 P. Wms. 702. And in the great and leading case of *Wellesley* v. *Beaufort*, 2 Russ. 1, 11, where Lord Eldon examined the whole question of the power of chancery over infants, and whose opinion was unanimously affirmed by the House of Lords, (2 Bligh, N. S. 124), the Lord Chancellor said : "An act of Parliament has given the father the power of appointing a testamentary guardian for his children. One should think that the guardian so appointed must have all the authority that Parliament could give him ; and his authority is, perhaps, as strong as any authority that any law could give. But it is above a century ago, since, in the case of *Beaufort* v. *Berty*, it was determined, that the statute guardian was subject to all the jurisdiction of this court. The Lord Chancellor, in effect, said, 'I will not place the statute guardian in a situation more free from the jurisdiction of this court than the father is in ; ' so that he applied the acknowledged jurisdiction over the father, as a justification for interfering with the testamentary guardian. And he went further, for he added, 'that if he had a reasonable ground to believe that the children would not be properly treated, he would inter-

fere upon the principle that *preventing justice* was preferable to *punishing justice*; and that he ought rather to prevent the mischief and misbehavior of guardians, than to punish it when done.'"

There is, therefore, no ground whatever for the denunciation of the statute because of any possible wrong or injustice that might be done the infant, as the court of chancery is always ready to afford protection.

2. I come now to the second principal question presented, and that is, as to the force and effect of the order of the vice chancellor of New Jersey, taking the children from the testamentary guardian and adjudging them to the mother, in this District.  We have seen from the statement of facts, and the allegations of the pleadings in the *habeas corpus* case before the vice chancellor, that the father of the children had his legal domicile in this District up to and for many years prior to his death, though he died in New Jersey; and that the mother and children were all domiciled in this District, at the time of the death of the father of the children, and were so at the time of the application to the vice chancellor for the writ of *habeas corpus.*  It was distinctly shown and urged as a defence in the return to the writ that, by virtue of the statute law of the domicile of the deceased father, and of his wife and children, the father had, by his will, duly appointed his sister, Mrs. Perrine, guardian to his children, and that such will had been duly filed for probate in the Probate Court of the District of Columbia.  The vice chancellor, acting under special statutory and limited authority of the State, which, at most, and under the most favorable construction of the authority, only authorized him to relieve from illegal restraint, if such illegal restraint was found to exist, the children then in the care and custody of their guardian, and if the children were found to be too young to elect for themselves into whose care they would remain, to determine for them until the question of rightful guardianship (if that were really a question of dispute),

should be determined by a proper tribunal, and in a proper proceeding. But, instead of so proceeding, the vice chancellor, by his order of the 26th of November, 1895, regardless of his special power in the premises, and of the scope of the allegations of the applicant for the writ, proceeded, it appears, to declare that the minor children were illegally restrained from the custody of their mother by the respondents, and that the mother is, by the law of the land, *entitled to such custody as against the respondents, or either of them,* and thereupon ordered and decreed that the children be discharged from all illegal restraint and detention in which they were held by the respondents, or either of them, and that the care, custody and control of said children be, and they were thereby, committed and given to the petitioner, their mother, *for and during their minority, and for and during the minority of each of them, respectively, as against the respondents, or either of them.* Thus making and constituting the mother the *permanent guardian* of the persons of the children, until they respectively attain the age of 21 years, notwithstanding the fact that there had been a legal testamentary guardian appointed at the domicile of the children, and which appointment had been, by express allegation, brought to the attention of the vice chancellor, as a defence to the writ. And this appointment of permanent guardianship by the vice chancellor, was to have effect and operation in this District, though made by a tribunal of special and limited jurisdiction in the State of New Jersey, regardless of the positive statute law here in force, and under which an appointment of guardian had been duly made. A clearer case of the conflict of law and jurisdiction could not be presented, if we assume that the order of the vice chancellor could have any force and operation beyond the limits of the State of New Jersey.

Now, in the first place, the question of the *right* of guardianship of the children was not the ground of the application for the writ of *habeas corpus;* the question, therefore, of

the mother's right to guardianship of the children was not presented, and therefore not involved; and the vice chancellor was not called upon to decide any such question, as against the respondents. He, therefore, deciding as he did, decided in respect to a right that was not involved in the pleadings, and his order was, consequently, simply void, and not entitled to full faith and credit in any other jurisdiction. A judgment or order of one State, to be conclusive upon the parties to the litigation in another State, must be responsive to the matter involved in the issue made by the pleadings in the first case. Any mere extra-judicial opinion or order will not bind. In the *habeas corpus* case in New Jersey, the respondents were not in court, and were not notified as to the day,'when the order declaring and adjudging the rights of the petitioner was made. The effect of such order made without the presence of the defendants, and without the issue made by the pleading, was fully considered by the Supreme Court, in the case of *Reynolds* v. *Stockton*, 140 U. S. 254, 266–270, where it was held, that a decree or judgment so rendered was without legal effect or binding force. See, also, the case of. *Monday* v. *Vail*, 34 N. J. Law, 419, in support of the same principle.

Then, in the second place, the application for the writ of *habeas corpus* was made to the vice chancellor for the exercise of a mere statutory power with which he was invested, and not the general chancery powers vested in the chancellor by the constitution of the State; and the vice chancellor transcended his jurisdiction, by undertaking to exercise general chancery jurisdiction, by appointing the mother permanent guardian of the persons of the children, until they should attain the age of twenty-one years, respectively. This order or decree of the vice chancellor has been, by the chancellor of the State, since the filing of the opinion of the majority of the court in this case, and before the time for sending down the mandate to the court below, set aside and vacated, upon the ground that the vice chancellor had

exceeded his authority or jurisdiction under the statute, in assuming general chancery powers in making the mother the permanent guardian of the persons of the children. 24 Wash. Law Rep. 381. The very foundation, therefore, upon which the judgment of the majority of this court is based has been taken away and entirely destroyed; and the judgment of this court gives effect to a judgment that has now no existence.

Indeed, it is clear, upon settled principle, that in an application for *habeas corpus*, like that made to the vice chancellor, the question whether the petitioner should be appointed guardian of the infant is not a proper subject of consideration; nor is it proper that such a question, in a summary way, in a *habeas corpus* proceeding, should be tried and determined. This has been expressly held in many cases (*Matter of Wollstonecraft*, 4 John. Ch. 80, 82; *People* v. *Mercein*, 8 Paige, 55; Opinion of Judge Betts, *In matter of Barry*, referred to with approval, and directed to be published by the Justices of the Supreme Court, as an appendix to case *In re Burrus*, 136 U. S. 586, 594, 597, 615); and nowhere has this principle been more explicitly asserted than by the courts of New Jersey. In the case of *Baird* v. *Baird*, 4 C. E. Green, 370, the chief justice of that State, in delivering the opinion of the court, said : "If the simple purpose was to free from illegal restraint, the proceeding was either in the law courts, or in chancery by the instrumentality of the *habeas corpus*; and in such proceedings a court of equity had no power to make any order which was not within the competency of a law judge. But, on the other hand, where the object was to *fix the status* of a minor *with regard to permanent custody or guardianship, and to settle for any course of time* the rights of contending parties to such custody, then the application was to the chancellor *by virtue of his general superintendency over the concerns of infants.*" But this principle was wholly disregarded by the vice chancellor, and notwithstanding he was in the exercise of a special and limited

9 Ct. App.—13

authority given him by statute, he proceeded to exercise to the fullest extent the authority that belonged alone to the chancellor. And in doing so, the rights of the legally constituted guardian by virtue of the statute law of the United States for this District, were utterly ignored and refused all recognition. The aunt was and is still the legally appointed guardian by the law of the domicile of the deceased father, and of his children; and by refusing to give effect to that appointment, made under the statute law of this District, the law and authority of the United States were denied all force and effect by the order of the vice chancellor. And this is the order that this court is appealed to to give it full faith and credit, and to declare that it is binding and conclusive as to all rights professed to be determined by it; and this has been done by the opinion and judgment of the majority of the court.

But if it were conceded that the order of the vice chancellor was valid and enforceable in the State of New Jersey, does it necessarily follow that the order is within the meaning and contemplation of Art. 4, Sec. 1, of the Constitution of the United States, and therefore entitled to full faith and credit in this District, and to be enforced here, as it could or might be enforced in the State of New Jersey? I am clearly of opinion, it is not.

It is not every order or judgment of a court of one State that is entitled to be enforced in every other State or district of the United States. There are many orders and judgments of State courts that, from their peculiar character or local operation, are not entitled to be enforced in an extra-territorial jurisdiction. This may be affirmed of orders passed under State insolvent laws; judgments and orders of probate courts; judgments in States where imprisonment for the debt recovered may be made a part of the judgment, that the defendant be imprisoned until the debt be paid; judgments rendered for penalties; and many other cases that might be enumerated.

In the case of *Cole* v. *Cunningham*, 133 U. S. 107, 112, it is said that the constitutional provision, and the act of Congress declaring the effects of judgments, do not prevent an inquiry into the jurisdiction of the court to render the judgment, nor into the right of the State to exercise authority over the parties or the subject matter. It is also declared that the Constitution did not mean to confer any new power on the States, but simply to regulate the effect of their acknowledged jurisdiction over persons and things within their territory. "It did not make judgments of the States domestic judgments to all intents and purposes, but only gave a general validity, faith and credit to them as evidence. No execution can be issued upon such judgments without a new suit in the tribunals of other States, and they enjoy, not the right of priority or privilege or lien which they have in the State where they are pronounced, but that only which the *lex fori* gives to them by its own laws, *in their character of foreign judgments.*" It is certainly clear, if this order of the vice chancellor of New Jersey stood upon the footing of a foreign judgment strictly, it could have no extra-territorial operation or effect ; and I think it clear that neither the Constitution nor the act of Congress gives it any extra-territorial operation or effect in addition to that it would otherwise have, whatever might have been its effect and operation in New Jersey.

In *D'Arcy* v. *Ketchum*, 11 How. 165, a statute of the State of New York provided, that, where *joint* debtors were sued and one was brought into court on process, if judgment should pass for the plaintiff, he should have judgment and execution not only against the party brought into court, but also against the other *joint* debtor or debtors named in the original process, in the same manner as if they had all been taken and brought into court on the process; but that it should not be lawful to issue or execute an execution against the body, or against the *sole* property of any person not brought into court. The judgments so rendered under the

statute, against a *joint* debtor, though not brought into court, had always been treated and regarded in the State of New York as entirely valid, and that the *joint property* of the defendants named in the process could be seized in satisfaction of the execution on the judgment. But a suit on one of these judgments was brought in a sister State against a joint debtor not served by process before recovery of the original judgment, and the question was, what effect or faith and credit, was such judgment entitled to have given it in another State than that where it was rendered. The Supreme Court held that such judgment was not entitled to any faith and credit whatever, beyond the limits of the State of New York, under the Constitution. The Supreme Court said : " No faith and credit, or force and effect, has ever been given to such judgments by any State of this Union, so far as we know ; the State courts have uniformly, and in many instances, held them to be void, and resisted their execution by a second judgment thereon ; and in so holding they have altogether disregarded, as inapplicable, the Constitution and laws of the United States. We deem it to be free from controversy that these adjudications are in conformity to the well established rules of international law, regulating governments foreign to each other ; and this raises the question, whether our Federal Constitution and the act of Congress founded on it have altered the rule ? " And the court declared that when they looked to the previous law, and the evil intended to be remedied by the framers of the Constitution and by Congress, they could not bring their minds to doubt, that the act of 1790 *did not operate on or give additional force to* the judgment under consideration ; that they concurred with the various decisions made by the State courts, holding that Congress did not intend to embrace judicial records of the description of that before the court.

I am clearly of opinion, therefore, that the order of the vice chancellor of the 26th of November, 1895, and signed by the chancellor, derived no additional force or operation

from the Constitution and laws of the United States; and from the very nature of that order, and the circumstances under which it was made, it could have no extra-territorial operation and effect as a binding judgment to override the laws in force, and to defeat the rights of the testamentary guardian, at the domicile of the minor children.

But in any view of the case, upon the plainest and best settled principles of international or interstate comity, the courts of New Jersey were bound to recognize the right of the testamentary guardian appointed by the father of the children, under and by virtue of the statute law of the United States in force in this District. It was not necessary that the will should have been admitted to probate at the time to give effect to the appointment (2 Kent Com. 224, 225) ' though it has since been duly admitted to probate in this District. The appointment was good and effectual without probate of the instrument by which it was made.

In 4 Phillimore International Law, p. 377, the author says: " Whatever may be the difference in the positive laws of different States with respect to the mode of constituting a guardian, the rule of international comity imperatively demands that a guardian duly constituted according to the laws of the domicile of the ward should be recognized as such by all other countries." The same principle is laid down by Wharton, in his work on the Conflict of Laws, Secs. 259, 260. See, also, *Harding* v. *Weld*, 128 Mass. 591.

That great international principle, however, as we have seen, was wholly ignored by the court in New Jersey; and I regret to say my brothers of this court, by their opinion and judgment, have given full faith and credit, and full force and effect, to the order of the New Jersey court, as a binding and conclusive judgment, to the entire exclusion and denial of all force and effect of the statute of 12 Car. 2, Ch. 24, Sec. 8, and of the acts of Congress adopting and incorpor t-ing that statute into the statute law of this District. It was not a question of the mere construction of the statutes in

force here, and which governed the mother and her children, but it was the entire displacement and complete disregard of those statutes, as if they did not exist, in order to give full force and effect to the order passed in New Jersey. Indeed, in the causes assigned for the demurrer to the return to the writ of *habeas corpus* in this case, it is alleged that the will of the father, appointing his sister testamentary guardian to his children, is immaterial and irrelevant in the cause," "first, because of the proceedings in New Jersey, and, second, because there is not now, and never has been, any law in force in this District which gives to a father the right by his will to deprive the mother of his children of their custody and society." If this contention be true, (and the opinion of the majority of the court would seem to give effect to it), then a father, no matter how improper or unfit the mother may be to have the custody and care of the children, whether from moral or mental defects of character, could have no power by will to protect his children against the demoralizing and vicious influence of such a mother, or to secure to his children proper tuition and training for life. Without reference to the facts contained in the record in this case, but in view alone of the statute law in force in this District, I cannot for a moment assent to such a proposition as that here asserted.

There is nothing in the record to impeach in the slightest manner the entire fitness and competency of Mrs. Perrine to discharge, in the most faithful and beneficial manner, the duties of guardian to these children. And there is nothing to show that the children are not entirely happy and contented in her care and custody; and under such circumstances, it is my judgment that they ought to be allowed to remain in the custody of their duly appointed guardian—and to whose custody and tuition they stand committed by a still subsisting order of the court of equity of this District.

In conclusion, I may adopt the appropriate language of Senator Paige, used in delivering one of the majority opinions in the celebrated case of *Mercein* v. *The People,* 25 Wend. 100, in the Court of Errors of New York—that it is the benefit and welfare of the infant to which the attention of the court ought principally to be directed. And, as a necessary result of this principle, it follows that the custody of infant children must always be regulated by judicial discretion, exercised in reference to their best interest. Where an infant is brought up on *habeas. corpus,* the court will not decide upon the right of guardianship, and if there is no improper restraint, the court will not deliver over the infant to the custody of another. If the infant is competent to form a judgment and declare his election, the court will, after examination, allow him to go where he pleases, otherwise will exercise its judgment for him ; and this judgment is to be exercised (being in lieu of the judgment of the infant) with reference to the interest and welfare of the infant. The interest of the infant is deemed. paramount to the claim of both parents. This is the predominant question which is to be considered by the court or tribunal before whom the infant is brought. The rights of the parents must in all cases yield to the interest and welfare of the infant. These principles are fully supported by the authorities referred to by the learned judge.

This opinion has been extended much beyond the limits originally intended for it; but appreciating the seeming importance of the subject, I could not well restrain myself in expressing fully, however imperfectly, the views that I entertain in regard to the case. I regret exceedingly the necessity of dissenting from the opinion of my brothers; but, with the convictions that I have in regard to this case, I could not do otherwise than dissent from the opinion of the majority. In my judgment, the order appealed from ought to be affirmed.

A writ of error to the Supreme Court of the United States was allowed ; and in that court the writ was, on November 30, 1896, dismissed for want of jurisdiction. *Perrine* v. *Slack,* 164 U. S. 452.